### J. A. WRIGHT V. THE STATE.

*No. 1334. Decided November 11th, 1896.*

1. **Manslaughter—Insults to Female Relatives—Exclusion of Evidence.**

On a trial for murder where defendant took bills of exception to the refusal of the court to permit testimony of insulting language by deceased towards female relations of defendant, and it appeared that the offer of such testimony was not ac-companied by a proffer by defendant to show, that, prior to the killing, the insult-

ing conduct of deceased was communicated to defendant, and that he killed de-
ceased on the first meeting thereafter. Held. The testimony was properly excluded.

### 2  Same—Expert Testimony.

On a trial for murder. it is permissible for a witness, who is expert in such mat-
ters, to testify that he could approximate the size of the ball from the size and char-
acter of the wounds on the body of the deceased

### 3.  Same—Harmless Error.

Error committed in permitting a witness to give his opinion as to the size of the
balls which inflicted the wounds upon deceased's body, becomes harmless where the
defendant admitted that he did the shooting with a 44-caliber Winchester.

### 4.  Evidence to Show Animus of a Witness—Subscribing Money to Prose-
cute.

It is not error to refuse to permit a witness to state what occurred in the grand
jury room, as to raising a subscription to employ counsel to prosecute defendant;
but, it is competent to prove by a witness that he had contributed money towards
the prosecution of defendant.

### 5.  Evidence as to Conversation of Third Parties.

Testimony of a witness as to a conversation between himself and another party,
which was in the presence of, and heard by defendant, as to the witness going with
defendant to a certain place to await the coming of the deceased, and taking his gun
with him, is admissible. and, where it is shown, that the parties knew what they
went for, and co-operated in the commission, it is immaterial whether the witness
went at the instance of defendant or of such other party.

### 6.  Evidence as to Insults to Female not Related to Defendant.

It is not error to exclude testimony as to insults by deceased towards a female not
a relative of defendant, and where such transaction had nothing to do with the
killing.

### 7.  Impeachment of Defendant by Statements, etc., Made While in Ar-
rest and Unwarned.

Where a defendant becomes a witness in his own behalf, it is not competent for
the State, on cross-examination. to draw from him statements or declarations, made
by him in jail or while under arrest, without being warned, for any purpose, either
as original testimony against him or in order to lay the predicate to contradict him,
and thus impeach him by other witnesses. Following, Morales v. State, ante p.
234.

### 8.  Improper Argument of Counsel—Special Instructions as to.

Where counsel for the prosecution has made improper deductions from the evi-
dence, and reflected upon and stigmatized defendant's witnesses in an 'unwarranted
manner, it is error for the court to refuse defendant's special instructions charging
the jury not to consider such remarks.

APPEAL from the District Court of Medina. Tried below before Hon.
EUGENE ARCHER.

Appeal from a conviction for manslaughter; penalty, two years' im-
prisonment in the penitentiary.

The indictment charged appellant with the murder of J. J. Glover, in
Medina County, on the 26th of June, 1894, by shooting him with a
gun.

The deceased, Glover, was the son-in-law of the defendant, J. A.
Wright. The record is not clear as to the original cause of the trouble
between the parties; but, it seems that they had been at outs for a year
or more before the killing, and it was proved that deceased had made
serious threats against the life of defendant on more than one occasion.

Mrs. Glover, the wife of deceased, testified, that on one occasion she had gone with her husband into the pasture of her grandmother, Mrs. Campbell, looking for their horses, when they saw the defendant coming along a pathway, leading through the pasture, and deceased raised and cocked his gun, which he had with him, and would have shot him from behind some bushes, if she had not prevented him by seizing the gun. Mrs. Campbell, the grandmother of deceased's wife, had a law suit regarding some lands, which was pending in the District Court at Hondo City. The week before the killing, Mrs. Campbell and the defendant, Wright, had gone up to Hondo City to attend the trial of the case. Deceased had also gone up to attend court, but whether he had any connection with the land suit is not disclosed. The defendant and his wife were living at the house of Mrs. Campbell at this time, and when her husband went off to attend court at Hondo City, Mrs. Glover, wife of deceased, also went over to Mrs. Campbell's, her grandmother's, to stay. The deceased returned home, and went on down to Mrs. Campbell's, where his wife was, and seemed to be very angry. The women folks all met him, when he entered the house, that is, Mrs. Wright, wife of the defendant, and Mrs. Glover, the wife of the deceased, and Mrs. Perkins, a sister of Mrs. Glover's. Mrs. Wright asked him if he had seen her mother, Mrs. Campbell, at Hondo City. He stated in very vulgar language, "Yes, he had, and had slept with her the night before." He then cursed and abused all the women in a most outrageous manner, calling them whores, and telling his wife that he had had carnal intercourse with every one of them, and charging Mrs. Wright, wife of defendant, with incest with her brother, Bob Campbell, telling her that he intended to go to town and prosecute them for it.

On the morning after Mrs. Campbell and the defendant returned from Hondo City, Mrs. Wright, the defendant's wife, told him of the conduct and language which had been used by deceased to herself and the others, and in regard to her mother. Defendant took a Winchester, which he had borrowed from a neighbor a few days before, and, he testified, "that he went down into the field, where deceased was plowing out cotton, and waited behind a little bush until deceased plowed up to within about seven feet of him, when he stepped in front of him and said· 'Glover, you have been abusing my family;' and he replied, 'I did intend to insult you, you God damned son-of-a-bitch,' and ran his hand into his pocket and got his pocket knife, and I commenced shooting him, and God knows how many times I did shoot him. After I had finished shooting, I went through the fence, threw the cartridge hull out of my gun, put another in and went to the house, and went with Jim Love from there to Devine and gave myself up to Bill Bowman, and Bowman took charge of me."

Defendant was asked, on cross-examination, if he did not tell a Mr. Brown that deceased started to draw his pistol on him, and he shot him. Defendant objected to proof of any conversation with the witness,

Brown, because he was under arrest at the time. The court overruled his objection, and allowed the testimony for the purpose of impeaching him. Defendant then stated, that he had not told Brown anything of the kind, and afterwards, Brown was permitted to testify, over defendant's objection, that defendant had made this statement to him.

The State asked its witness, John Howard: "Could you tell by looking at the wounds about what sized bullets had made them?" to which defendant objected, because he had not qualified as an expert, and it was not such a matter as an opinion could be given concerning it, and thereupon the said witness, in answer to questions by the State, said: "I have hunted nearly all my life with firearms, since I was a little boy. I have used guns all the way from 22 to 56 caliber," and thereupon the court asked the question: "From that experience can you tell the size of a ball by looking at the wounds in an animal?" To which witness replied: "No, sir, but I could tell a 22 from a 45." And thereupon the State's counsel asked the question: "Whether you could tell from looking at any of those wounds, having seen the manner in which they entered the body, could you tell what size ball had made them?" And defendant again urged his objections as above to the testimony, but the court overruled the objection and the witness replied: "I could not tell exactly the calibre, but I could come somewhere near it," and thereupon the State's counsel inquired of the witness: "About what size do you think they were?" which witness answered thus: "All the way from 38 to 45 caliber. A man could tell whether he was shot with a 38 or 45 if it was a 38 short, but if it was a 38 improved long you can't tell which gun, a 38 or 45," and thereupon the defendant took his bill of exceptions. The defendant proposed to show by the witness, John Howard, on cross-examination, that he was on the grand jury that found the bill of indictment. That after it was voted upon and agreed upon by the grand jury, and while the said grand jury was not deliberating upon any business before them, the said John Howard proposed to the members of the grand jury that each one of them should become with him a subscriber to a special fund to prosecute the defendant.

The State's counsel asked the witness for the State, Jim Love, certain questions—said Love having testified that he and Wright went out to the tomato patch on Monday night before the killing to watch it. That Love carried a Winchester and Wright a shotgun, and thereupon the State asked him (Love) the following question: "I'll ask whether or not, when you went to the tomato patch, whether the remark Mrs. Campbell made was made in the presence of Wright?" To which he replied: "I don't know whether it was made where Wright was or not." Question: "Was the remark she made in relation to what she (you) was going out there for or in regard to something else?" Answer: "She wanted me to go out to the tomato patch." Question: "I'll ask whether or not what was said by Mrs. Campbell had anything to do with your going out there, and was it in the presence of Mr. Wright?" Answer: "I don't know whether it was, but Mrs. Campbell wanted me to go out

there." Question: "Then it was upon her request you went out, and not upon Wright's request?" Answer: "Yes sir." And thereupon the defendant objected to the evidence that Mrs. Campbell wanted said Love to go to the tomato patch because it was hearsay testimony, and not shown to be in the presence of the defendant, and was introduced only to show a combination between Mrs. Campbell and the defendant, but the court overruled the defendant's objections, etc.

The State sought to prove by the defendant's witness, Mrs. Rena Perkins, wife of John Perkins, that John Perkins was up at his mother's when the killing took place; that she saw him first after the killing when he ran up and overtook her or met her just a little piece from the house of her grandmother, Mrs. Campbell. She did not know exactly how far, she expects about 100 or 200 yards; that her husband was not very far behind Mrs. Glover, but came running, and Payne was with him. Neither of them had a gun. Her husband did not have a gun and bring it down to the house after the killing; that she did not know it to be a fact that John Perkins had gone after or been sent after Griffin's gun that morning, but the defendant objected to this and all other testimony by Mrs. Perkins that would tend to criminate her husband, John Perkins, or connect him with the killing of the deceased, because the witness was the wife of said John Perkins, and could not, in any case, testify against him, and because it was shown to the court that the said John Perkins had been indicted for the killing of the deceased and the prosecution dismissed against him, but the court overruled the defendant's objections, etc.

*S. B. Easley* and *John A. Green, Jr.*, for appellant.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at two years in the penitentiary, and he prosecutes this appeal. In this case appellant took several bills of exception to the refusal of the court to permit testimony that the deceased had used insulting language toward the female relations of the defendant. The offer of this testimony was not coupled with any proffer on the part of counsel to show that, prior to the killing, the same were communicated to the defendant, and that thereafter he shot the deceased on his first meeting with him; and the court informed counsel that, if they would connect said testimony as above stated, he would admit the same. There was no error in this action of the court. Objection was also made to the witness, John Howard, testifying that he could approximate the size of the ball from the size and character of the wounds he saw in the body of the deceased, and that said wounds were inflicted by a ball all the way from 38 to 45-caliber. This was objected to on the ground that it was not such a matter concerning which an opinion could be given,— that it was not a matter of expert testimony. We believe that this testimony was admissible. Concede, however, that it was not, the object

of it was to prove that the wounds were inflicted by bullets of 44-caliber. There was no question as to this.    The defendant himself admitted that he did the shooting with a 44-caliber Winchester.    Nor, as explained by the court, was there any error in the refusal of the court to permit the witness, Howard, to state what occurred in the grand jury room as to raising a subscription to employ counsel to prosecute the appellant. It was intended by this testimony to show the animus of the witness, Howard, who testified on behalf of the State, and the court shows that the defendant was permitted to prove by this witness that he contributed money towards the prosecution of the defendant in this case.    Objection was also made to the witness, Jim Love, testifying as to a conversation between him and Mrs. Campbell the night that said Love and defendant Wright went to the tomato patch with their guns to await the coming of the deceased.    It appears that the defendant was present at the time, and in a situation to have heard the conversation.    The testimony only showed that Love went with his gun at the request of Mrs. Campbell, rather than at defendant's request, though he went with the defendant, and they both were engaged in the same mission, and understood what they went there for; and it is immaterial whether he went at Mrs. Campbell's request or at the instance of the defendant.    He went with the defendant, to co-operate with him in whatever he did.    There was no error in the exclusion of the witness, Ludwig's, testimony to the effect that deceased may have cursed and abused the wife of said Ludwig.    She was not related to the defendant, nor did said transaction have anything to do with the killing in this case.    We do not understand that John Perkins was on trial in this case, or that the defendant can avail himself of an objection to testimony by the wife of John Perkins that might tend to incriminate him (John Perkins) in the killing of the deceased.    However, the testimony of Mrs. Rena Perkins did not have that effect. When the defendant, J. A. Wright, was on the stand, testifying on his own behalf, on cross-examination, the State was permitted, over the objection of the defendant, to ask him, "Did you not tell Mr. Brown when you went to see him (Brown) that he (Glover) started to draw his pistol on you, and that you then shot him?" and the defendant answered that he did not—that he was positive he did not mention a pistol, because the deceased did not have any.    This proceeding was had after the defendant had surrendered to the constable, Brown, and while he was under arrest, and had not been cautioned.    Subsequently the State was permitted to introduce George Brown, and to prove by him that, after the defendant had surrendered, said defendant stated to him that he had killed Glover in the field, had had some words with him, and he (Glover) started to draw his pistol, and he shot him.    This testimony was also objected to by the defendant, on the ground that at the time the statement was made the defendant was under arrest, and had not been cautioned, and his confession or statement could not be used against him for any purpose.    It will be noted, in this connection, that defendant testified that, on the morning of the homicide, he took his

gun, and went to see the deceased, who was plowing in a field, in regard to some abusive language that he had used a few days before to the wife and mother-in-law of the defendant, which language was insulting in the extreme, and had only been communicated to him on that morning; that he went to where the deceased was plowing in his field, to demand an explanation or an apology, and, when he approached the deceased, and asked him about it, deceased replied, "I did intend to insult you, you God damned son-of-a-bitch," and ran his hand in his pocket and got his pocketknife, and that then he (defendant) commenced shooting. The object of the State in cross-examining the defendant was to lay the predicate for impeaching him as to said transaction, and, on his denial thereof, to prove by the witness, Brown, that the defendant said deceased attempted to draw a pistol on him, and he shot him, instead, as he testified, that deceased ran his hand in his pocket, and got his pocketknife. The object and effect of this testimony, as stated, was to impeach the defendant by the witness, Brown, upon a most material part of the case. The evidence of the defendant showed that the deceased had a knife, but did not have a pistol. In the case of Morales v. State, decided at last Austin term of this court, ante p. 234, it was held that, where a defendant was in jail, or under arrest, although on the trial of the case he became a witness on his own behalf, it was not competent for the State, on cross-examination, to draw out from the witness statements or declarations made by him under such conditions, without being warned, for any purpose, either as original testimony against him, or in order to lay the predicate to contradict him, and thus impeach him by other witnesses. This case overruled Quintana v. State, 29 Tex. Crim. App., 401, and other cases on this line. Under the rule laid down in said case, the cross-examination of the defendant and the impeaching testimony of Brown were clearly not admissible.

While it was admissible for the State to draw any proper deductions from the testimony of the witnesses and their acts and conduct, going to discredit their testimony before the jury, counsel in this case seem to have used the testimony of Mrs. Campbell and Mrs. Wright, in regard to their failure to communicate the insulting language of the deceased to them to the defendant for several days thereafter, in order to reflect upon and stigmatize them as unchaste women. No evidence was offered of this character, and we do not believe that this was a legitimate deduction from the testimony, and, under the circumstances, we think the court should have given the charge requested by the appellant on the subject. This was not a case calling for a charge on circumstantial evidence. The appellant's assignment in that regard is not well taken. For the error of the court in permitting the cross-examination of the defendant, while on the stand, as to statements made by him while under arrest, and not having been cautioned, and permitting his impeachment by the witness, Brown, the judgment is reversed, and the cause remanded.

*Reversed and Remanded.*