[No. 2188]

## STATE OF NEVADA, RESPONDENT, v. FRED WILSON, APPELLANT.

[156 Pac. 929]

1. CRIMINAL LAW—EVIDENCE—CONFESSIONS—PRELIMINARY PROOF.
   A statement of defendant in police headquarters while under arrest charged with the offense is not admissible as part of the state's case in chief without a showing that the statement was voluntary, and made without hope of reward or inducement or fear of punishment.

2. WITNESSES — IMPEACHMENT — INCONSISTENT STATEMENTS — VOLUNTARY CONFESSION.
   One accused of crime who takes the stand as a witness cannot be impeached by proof of a confession which would be inadmissible as direct evidence because made while under arrest, and not shown to have been voluntary.

APPEAL from Second Judicial District Court, Washoe County; A. N. Salisbury, Judge.

Fred Wilson was convicted of manslaughter, and he appeals. **Reversed and remanded.**

Jas. T. Boyd and J. M. Frame, for Appellant:

The evidence is insufficient to support the verdict, and the court erred in overruling defendant's motion for a

new trial.    There was no eye-witness to the tragedy.
Defendant admitted the shooting and justified the act
upon the ground of self-defense.    There is nothing in
the evidence disclosing any motive for the alleged crime.
The presumption of innocence is the most favored pre-
sumption of the law, and stands in the nature of evidence
in favor of the defendant.   He testified in his own behalf;
and, while uncorroborated by any witness, he is strongly
corroborated by the facts and circumstances of the case.

The court erred in admitting testimony as to statements
made by defendant after the homicide, for the reason
that they were made involuntarily and under such circum-
stances as made their admission incompetent; and, if
admissible at all, they should have been offered as part
of the state's case in chief.

*Geo. B. Thatcher*, Attorney-General, and *H. C. Price*,
Deputy Attorney-General, for Respondent:

Where a defendant, on trial for murder, relies for
acquittal upon self-defense, it is competent to attack his
credibility by proving statements made by him out of
court as to the self-defense contrary to those made by
him as a witness on the trial.   (*People* v. *Rogers*, 18 L. R.
A. n. s. 799; *Ammons* v. *State*, 18 L. R. A. n. s. 790; *State*
v. *Cadotte*, 42 Pac. 857; *Garlitz* v. *Maryland*, 4 L. R. A.
601; *Smith* v. *State*, 137 Ala. 22; *State* v. *Avery*, 113 Mo.
475; *State* v. *West*, 95 Mo. 139; *State* v. *Broadbent*, 71
Pac. 1; *Cravens* v. *Bennett*, 30 Pac. 61; *McGuire* v. *State*,
57 South. 57; *Commonwealth* v. *Tolliver*, 119 Mass. 312;
*People* v. *Walker*, 140 Cal. 153; *State* v. *Cary*, 159 Ind. 504;
*State* v. *Kennade*, 121 Mo. 405.)

"When accused has testified in his own behalf, it is not
error to allow the prosecution to prove, in contradiction
of his testimony, declarations made by himself, although
such as might have been offered as a part of the case in
chief." (*Leighton* v. *People*, 10 Abb. N. C. 261, 88 N. Y. 117.)
It is not error to allow a witness to refresh his memory
by referring to and reading a written statement made by
himself.    (*Pinschower* v. *Hanks*, 18 Nev. 99.)

By the Court, McCarran, J.:

This is an appeal from a judgment following a verdict of conviction for manslaughter and from an order denying a motion for a new trial.

There are many assignments of error, most of which deal with the several instructions given by the trial court, but, in view of the fact that this case must be reversed by reason of the ruling of the trial court in admitting certain evidence hereafter set forth, we deem it unnecessary to dwell at length on other assignments.

During the course of the trial the defendant took the stand as a witness in his own behalf; and on cross-examination, over the timely objection of his counsel, certain interrogatories were propounded to him by the prosecuting attorney relative to a statement purported to have been made by the defendant shortly after the homicide, in the police headquarters, after he was placed under arrest. The record sets forth the following:

"Q. (by the prosecuting attorney.) Mr. Wilson, have you ever made any other statement relative to this occurrence, aside from the one which you have made down here on the witness stand? A. Well, I have told something about it.

"Q. To whom have you told it? A. I told the captain of police something about it.

"Q. Capt. Trembly? A. Yes, sir.

"Q. Did you tell any one else about it? A. I told you, I think, a little something about it.

"Q. Yes. A. Right after it happened.

"Q. About what time of the day was it that you told— A. Well, it was right after the occurrence; I don't know how long after; possibly 1:30.

"Q. In that statement which you made to me was any one else present? A. Yes, sir.

"Q. Was the statement freely made? A. What?

"Q. You made the statement voluntarily, did you not? A. Well, no; not altogether; I was asked questions.

"Q. Was any one else present at the time that statement was made? A. Yes, sir; there were three or four. * * *

"Q. Calling your attention to the following, I want you to listen to it and state whether or not you made this statement."

At this juncture, as the record discloses, the prosecuting attorney read from a paper a series of questions and answers purporting to be interrogatories propounded to and answers made by the defendant in the presence of the prosecuting attorney, the captain of police, Miss Callahan, a shorthand reporter, and others, in the police headquarters while he was under arrest charged with the killing of deceased. At the conclusion of these interrogatories the prosecuting attorney propounded the question:

"Q. Did you make such a statement, or did you not? A. I don't remember these statements.

"Q. Did you make them or did you not? A. Well, those statements, I don't remember them as they come, and I was very much excited.

"Q. Answer my question. A. And if I made those statements, why it was through excitedness."

Following this the record discloses that, over the objection of defendant's counsel, the witness Miss M. I. Callahan was permitted to testify:

"Q. What is your occupation, Miss Callahan? A. Stenographer in the district attorney's office.

"Q. Were you such stenographer on the 14th day of October of this year? A. I was.

"Q. I will ask you to state whether on that date you saw the defendant, Wilson. A. Yes, sir; I did.

"Q. Where did you see him? A. At the chief of police's office.

"Q. In what room? A. In an inner room in the police department.

"Q. Who was present at that time? A. Capt. Trembly, Mr. Nichols, and the district attorney, myself, and the defendant.

"Q. The district attorney? You mean me? A. Mr. M. B. Moore.

"Q. At that time I will ask you to state what was the appearance of the defendant? Did he appear to be

excited, or otherwise?   A. Why, he was very calm.   I particularly noticed that he was.   I made that observation to myself, that he was very calm for a person who was in danger of being charged with such a crime.

"Q. Did he make any statement in your presence and the presence of the others which you have named as to the trouble between him and the Japanese Wada?   A. Yes, sir; he did.

"Q. Did you take that statement down at that time? A. Yes, sir.

"Q. And did you afterwards extend it?   A. Yes, sir.

"Q. I will ask you to state, Miss Callahan, whether or not you recognize that (showing).   A. Yes, sir; I recognize this transcription.

"Q. Is this, Miss Callahan, the transcription of the notes which you took at that time?   A. Yes, sir.

"Q. I will ask you to state, Miss Callahan, if at the police station in the city of Reno, in the presence of myself, yourself, Capt. Trembly, and Mr. Nichols, you heard the defendant, in response to a question, the following question which I asked him, give the following answer: 'Q. What is your name?   A. Fred Wilson.'   A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question: 'Q. How long have you been here?'—did you hear him make the following answer: 'A. Why, since last February, I believe.'   A. Yes, sir.

"Q. At the same time and place, in the presence of the same people, in response to the following question propounded by me: 'Q. Been working at the Clarendon ever since?'—did he make the following answer: 'A. No; been working at the Clarendon since the 6th of March.'   A. Yes, sir.

"Q. At the same time and place, in the presence of the same people, the same persons, in response to the following question: 'Q. Night clerk or day clerk?'—did you hear him make the following answer:   'A. Both.'   A. Yes, sir.

"Q. At the same time and place, and in the presence

of the same persons, and in response to the following question propounded by me: 'Q. What caused this trouble down there, the shooting of this Jap?'—did you hear him make the following answer: 'A. Well, today— It started last night over a couple of hot rolls. He charged me 15 cents for them and I told him that it was too much, and we got into a little quarrel about it, and he told me to get out or he would kill me. I told him I would get out, but I said, "Don't you come in that back room, because that is my room, the toilet; so I locked the door." This morning he comes in and tries this door, and it was locked. He told me to open it, and I told him that I wouldn't. He went upstairs and had a talk with Mrs. Clark, and she sent for me. I went up and she asked me to open it, and I started down again, and in the meantime I had my club under the desk; I expected to have to use one; and he started to urinate on the floor.' Did he make that answer? A. Yes, sir.

"Q. At the same time and place, in the presence of the same people, in response to the following question: 'Whereabouts?'—did he make the following answer: 'Right next to the toilet, and I told him not to do it. And I looked around for my club, and it weren't there, and I thought I would take a chance with my bare fists, and he comes at me with my own club, and I dodged it and jumped back and pulled my gun and shot him.' A. Yes, sir.

"Q. At the same time and place, and in the presence of the same persons, in response to the following question: 'Q. Did he say that he would kill you?'—did he make the following answer: 'A. He told me that if I ever came in there any more he would kill me.' A. Yes, sir.

"Q. At the same time and place, and in the presence of the same persons, in response to the following question propounded by me: 'What conversation was had between you and him the morning of the shooting?'—did he make the following answer: 'There was hardly any conversation at all; only told me that he was going to

kill me, and attempted it right there with the big club. He struck at me with the club.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same people, in response to the following question propounded by me: 'What sort of a club was it?'—did he make the following answer: 'About twenty inches long with a string tied on the end of it. He went to strike and fell, and as he fell he threw the club in front of him.' A. Yes, sir.

"Q. At the same time and place, and in the presence of the same persons, in response to the following question propounded by me: 'Had you seen him this morning before the time that the shooting occurred?'—did he make the following answer: 'No, sir.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following query propounded by me: 'Is that the club?'—did he make the following answer: 'Yes, sir.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'That is your club?'—did he make the following answer: 'Yes, sir; that is it. It belongs to the hotel. I kept it under the desk.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'When was the last time that you saw it there?'—did he make the following answer: 'I put it under the desk this morning.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'How do you think that it came to be there?'—did he make the following answer: 'Just as he passed along through the office, when Mrs. Clark called me, I suppose he saw it; I suppose that he could see it.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'Did he strike at you more than once?'—

did he make the following answer: 'I didn't give him time, as he struck at me he fell.'   A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'What sort of a gun was this?'—did he make the following answer: 'A 32 automatic Colt's.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'Automatic?'—did he make the following answer: 'Yes, sir.'   A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'How long has the Jap been running this restaurant?'—did he make the following answer: 'I couldn't say; he has been there ever since I have been here.'   A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'Have any trouble with him before?'— did he make the following answer: 'No, sir; I never did.' A. Yes, sir.

"Q. At the same time and place, in the presence of the same persons, in response to the following question propounded by me: 'Who made that club?'—did he make the following answer: 'I don't know; it was in the house before I came.'   A. Yes, sir."

The statement is made in respondent's brief that this testimony in the first place was not sought to be introduced as a part of the state's case as a confession or statement of this defendant.   If it had been, they say it would have been neccessary to show that it was made freely, voluntarily, without any threat, not through fear or promise of reward.   They justify the acts of the trial court in admitting this testimony in the following statement:

"The defendant came on the witness stand a voluntary witness, and when he did so he became subject to all of

the rules that any witness is subject to, and is liable to impeachment the same as any other witness."

Respondent further seeks to justify the ruling of the trial court in admitting this testimony, by the statement that it was not direct testimony, and was sought to be propounded to the defendant as impeaching questions only to show that at another time, before other people, at an earlier date, he made a different statement.

1. It requires no citation of authority, as we view it, to support the assertion that, before the statement or series of answers made by the defendant in the police headquarters while he was under arrest charged with the offense could have been admitted as a part of the state's case in chief, it would have been necessary to lay a foundation for its admissibility, showing that the statement was voluntary, and that the same was made without hope of reward, inducement, or fear of punishment. (*State* v. *Dye*, 36 Nev. 143, 133 Pac. 935, and cases there cited.)

2. It is not contended by the respondent that any such foundation was laid, nor was it contended by the prosecuing attorney in the court below that the statements made by the defendant in the police headquarters were admissible as a part of the state's case in chief. We are asked to affirm the action of the trial court in admitting this testimony, solely upon the ground that the testimony was elicited by way of contradictory statements for the purpose of impeaching the defendant as a witness.

First, let us ask the question: Was the evidence competent in the first instance? Could it have been introduced against the defendant as a part of the state's case in chief? Manifestly not; for it lacked all the elements which go to make up a competent statement under such circumstances. Was it matter brought out in the direct examination and on which the defendant could be properly cross-examined? No. The contention of respondent that the defendant, having submitted himself as a witness in his own behalf, thereby subjected himself to cross-examination and impeachment to the

same extent as any other witness, is, in our judgment, answered by the familiar rules that a witness can be impeached only as to matters within the legitimate scope of cross-examination, and that no witness may be impeached by incompetent evidence. This being true, the whole matter turns on the question of whether or not the evidence elicited from the witness, Miss Callahan, was or was not competent. The answer is that it was not. Here was an introduction of testimony by the indirection of cross-examination which by reason of its lack of competency could not have been introduced as a part of the state's case. This entire question is extensively discussed in the case of *Harrold* v. *Territory of Oklahoma*, 169 Fed. 47, 94 C. C. A. 415, 17 Ann. Cas. 868. The court said:

"And right here is the limitation of the waiver by an accused person of his constitutional privilege under the second rule by testifying, and here is the evidence of the violation of that rule in this case. He may not 'be compelled in any criminal case to be a witness against himself.' When he testifies as a witness, he waives this privilege of silence and subjects himself to cross-examination and impeachment to the same extent as any other witness would subject himself thereto in the same situation, but no farther. He may be cross-examined upon the subjects of his direct examination, but not upon other subjects; impeaching questions relative to facts not collateral to the issue—that is to say, relative to facts which the prosecutor is entitled to prove as a part of his case—may be lawfully propounded to him (Wharton's Criminal Evidence, 9th ed. sec. 484), but such questions relative to facts that may not be so proved may not be asked him; and he may be impeached by competent proof of statements made by him contradictory to his answers to such lawful questions, but not by proof of answers contradicting unlawful questions. For these are the limits of the cross-examination and of the lawful evidence of impeachment of other witnesses."

Concluding the subject, the court said:

"The impeaching questions asked the defendant, and

the involuntary confession introduced to contradict his answers, were beyond the limits of legal cross-examination of him, or of any other witness in his situation, because they did not relate to the subjects of his direct examination, and because they were not germane to any fact which the prosecutor was entitled to prove as a part of his case. Hence the defendant did not waive his constitutional and statutory right to refuse to testify concerning the statements in his confession, and the propounding of the questions concerning them, and the introduction of the involuntary confession, were violations of that right."

A case quite analogous to the one at bar is that of *Brown* v. *State*, 55 Tex. Cr. R. 572, 118 S. W. 139. In that case the court said:

"Even before the last act of the legislature this court had held that confessions of a party under arrest made without warning could not be used against him, even for the purpose of impeachment, citing *Morales* v. *State*, 36 Tex. Cr. R. 234, 36 S. W. 435, 846; *Wright* v. *State*, 36 Tex. Cr. R. 427, 37 S. W. 732; *Bailey* v. *State*, 40 Tex. Cr. R. 150, 49 S. W. 102; *Rodriguez* v. *State*, 36 S. W. 439; *Walton* v. *State*, 41 Tex. Cr. R. 454, 55 S. W. 567; *Parker* v. *State*, 57 S. W. 668; *Johnson* v. *State*, 43 Tex. Cr. R. 476, 66 S. W. 846."

The case of *Shephard et al.* v. *State*, 88 Wis, 185, 59 N. W. 449, is interesting as bearing upon the subject. In that case the trial court had excluded a confession as being incompetent. The defendant, having taken the stand, was asked if he made that confession and denied it. The same witness who extorted the confession and whose testimony was in the first instance disallowed on that ground was allowed to testify to the confession, on the theory that it was not admitted as confession, but merely to contradict the defendant. The Supreme Court of Wisconsin, in commenting upon this phase of the case, said:

"The method here adopted to get the confession of Joseph Shephard in evidence, after it had been excluded by the court as being incompetent and inadmissible by

reason of its having been extorted by promises of immunity and threats of injury and by falsehood, was certainly very ingenious and plausible."

"The confession is just as objectionable as evidence, and as incompetent and hurtful, when offered in one way as in another. If no other evidence on the ground of contradicting the defendant as a witness could be found, he had better have gone uncontradicted than that his legal rights as a prisoner should be so violated, and his conviction obtained by such unlawful testimony. The object is to get the confession in evidence. It cannot be done directly, but it can be done indirectly. It cannot be used to convict, but it can be used to contradict, the defendant, and in that way it is used to convict him all the same. We cannot adopt such a principle or practice in the administration of criminal law. It is unreasonable as well as unjust."

In the case of *People* v. *Yeaton,* 75 Cal. 415, 17 Pac. 544, the matter at bar is emphatically dealt with. In that case the rule is supported that the defendant in a criminal prosecution, who is a witness in his own behalf, cannot be compelled on cross-examination to testify to statements made by him out of court which amount to a confession of the crime, unless it be first shown that the confession was voluntary; and the fact that the evidence was offered by the prosecution, not as a confession, but merely as a contradictory statement, for the purpose of impeaching the defendant who became a witness in his own behalf, makes this rule none the less enforceable and just.

The error complained of in this respect was one which directly affected the rights of the defendant. For this reason, the case must be reversed and remanded for a new trial.

It is so ordered.