THE STATE OF NEVADA, Respondent, *v.* RICHARD LINDLEY BOUDREAU, Alias DICK BAYS, Appellant.

No. 3571

January 25, 1950.                    214 P.2d 135.

*Orville R. Wilson* and *F. Grant Sawyer,* both of Elko, for Appellant.

*Alan Bible,* Attorney General, *George P. Annand* and *Robert McDonald,* Deputy Attorneys General, and *A. L. Puccinelli,* District Attorney of Elko County, Elko, for Respondent.

## OPINION

By the Court, HATTON, District Judge:

Richard Lindley Boudreau, alias Dick Bays, the defendant in the trial court, is the appellant here. He will be referred to herein as the defendant. The defendant was charged with the murder of Richard Stewart by an information filed by the district attorney of Elko County, Nevada, on October 28, 1948, to which he entered his plea of not guilty. Upon the trial he was found guilty of murder of the first degree and the death penalty was imposed by the jury. He brings this appeal from the judgment and from the trial court's order denying his motion for a new trial.

In the defendant's opening brief, two assignments of error are stated, as follows:

"1. That the verdict was contrary to the evidence in that the same shows that defendant was not guilty of the degree of the crime of which he was convicted but was guilty of a lesser degree thereof.

"2. The purported written confession of defendant was not voluntary in that the same was taken from said defendant when his physical condition did not allow for his independent and voluntary action in giving the confession; also said confession was taken prior to the time defendant was conducted to a magistrate."

The record discloses that Richard Lindley Boudreau, the defendant, a youth of eighteen years, was employed on a ranch in Elko County, Nevada, in the summer of 1948. On or about September 1, 1948, he transferred his employment from the ranch to the Southern Pacific Railroad Company, at Alazon, Nevada, which is situated approximately five and one-half miles west of the town of Wells, in Elko County. He was known as Dick Bays until after the homicide. On the afternoon of October 9, 1948, the defendant, in company with Richard Stewart, the deceased, and two other employees of the railroad company, left Alazon in an Oldsmobile sedan, the property of Stewart, with the purpose of going to Twin Falls, Idaho, to attend a dance at that place. They stopped first at Contact, Nevada, about fifty miles north of Wells, where they were joined by Alvin Loos and Edna Robertson, and then proceeded on northward and, at San Jacinto, they were joined by Wilma Robertson. At Rogerson, Idaho, they were joined by Delilah Helsley. They arrived at Twin Falls at about nine to nine-thirty that night. At midnight, after attending the dance, the party, excepting the two unnamed employees of the railroad company, entered Stewart's automobile and returned to Contact, arriving there at about two in the morning of October 10, when Alvin Loos and the three girls left the car and remained at Contact, while the defendant and Stewart, in the latter's car, proceeded on the highway towards Wells. At about four o'clock that morning, the defendant entered the office of the

telegraph operator at Alazon and stated that he was out of gasoline. The operator was unable to supply him, and it seems that he obtained some gasoline from the railroad company's supply. That afternoon, between four and four-thirty, the defendant entered the Thousand Springs Trading Post, which is approximately midway between Wells and Contact, and purchased a bus ticket to Contact. He was recognized as Dick Bays by the man who sold him the bus ticket, defendant having visited the Trading Post during his ranching employment. He left on the bus at about five to five-fifteen in the afternoon. At about six to six-thirty, the man who sold the bus ticket to defendant, in company with others, left the Trading Post to go deer hunting. They proceeded north on the highway until they came to a road known as the Loomis Pasture road. About three and one-half miles out on this road, the hunting party came. upon the Oldsmobile sedan, belonging to the deceased. It had a flat tire. They noticed a bullet hole in the side window on the driver's side and, scattered about the car, were tools, articles of clothing, blood-stained seat covers, a blood-stained leather jacket and a billfold containing papers bearing the name Dick Bays. They returned to the Trading Post and summoned Constable Homer Murphy from Wells. That night, at about nine-thirty, Alvin Loos, above referred to, saw the defendant at the Mineral Hot Springs, near Contact, and he inquired of defendant as to the whereabouts of Stewart. Defendant answered that Stewart had gotten mad at defendant; that he, defendant, left Stewart's car at Wells, and that Stewart said he was going to Wyoming. About an hour later, Loos again talked with defendant, and the latter stated that he had quit his job at Alazon and was going back east. After Constable Murphy had been informed relative to the abandoned car, he summoned Undersheriff J. C. Harris from Elko, and they went together to the car, and the car was recognized by Murphy as the car belonging to Stewart. A further examination of the car disclosed a box of groceries and a .32 calibre

automatic pistol, which was later identified as having been purchased by defendant in Twin Falls and also identified as the weapon which caused the wounds from which Stewart died. The officers proceeded to Mineral Hot Springs, where they approached the defendant and engaged him in conversation in the course of which the defendant stated that he had traveled from Wells to Contact by bus and that he did not know the whereabouts of Stewart. Defendant was searched and was found to be in possession of the car keys, a wallet containing a registration card, an identification card, driver's license and certificate of title of the car referred to, all made out to Richard Stewart, and a birth certificate made out to Richard Lindley Boudreau. Defendant was then taken into custody and was taken to Wells where he was placed in the jail there between one and one-thirty in the morning of October 11, 1948. Between one-thirty and two that morning, Officers Murphy and Harris, accompanied by William Stewart, a brother of the deceased, went to the jail and questioned the defendant. Both of the officers testified that, during the questioning, the defendant stated that he had shot Richard Stewart five times and that he would show the officers where Stewart was if they would take him there. The officers, accompanied by defendant and under his direction, then proceeded on the highway to a point about three miles south of Contact and there the body of Stewart was found about one hundred feet off the highway.

Constable Murphy testified that the defendant was returned to the jail at Wells at about four or five o'clock in the morning; that he, Murphy, called at the jail a number of times during the day, that defendant was lying on the bed, that he did not question defendant further about the homicide but just asked him if he wanted anything. The evidence tends to show that during the day the defendant was provided with proper food and that he was not disturbed. At about eight o'clock that evening, the defendant, in the presence of

the district attorney, Constable Murphy, Russell R. Plank, inspector of Nevada State Police, and a young lady stenographer, made and signed the following confession:

"I, Richard Lindley Boudreau, also known as Dick Bays, hereby make the following statement, freely and voluntarily, without duress, undue influence, promise of reward and after being fully advised of my rights to an attorney and with full knowledge that whatever I say may be used against me.

"I was born on the 6th day of October, 1930 in Lynn, Massachusetts. I came to Wells, Nevada on or about September of 1948 where I have been working at Alazon for the Southern Pacific Railroad Company.

"On Saturday, October 9, 1948 at about 5 p. m. I left Alazon with Jimmy and Johnny who bunk next to me and Richard Stewart. We were driving in Stewart's car which is a 1936 Oldsmobile, tudor sedan. We were headed for Wells, Nevada, where we were going to let out Johnny and Jimmy and then Dick and myself were going to Contact, Nevada to pick up Alvin Loos and his girl friend, Edna Robertson and we were going to Twin Falls, Idaho to a dance. On the way to Wells Johnny and Jimmy asked Stewart if he was coming back Saturday night and he said 'Yes.' They then both decided to come along. When we got to Wells we all went into a cafe which is on the highway in Wells and had a sandwich. Johnny and Jimmy bought some whiskey. When we had finished eating we all took off for Contact. This was about 6 p. m. Saturday night. Stewart was driving his car.

"We arrived in Contact about an hour or an hour and fifteen minutes after we left Wells. We went to Alvin's girl's house to pick up Al and his girl, Edna. Al said we were to drive to San Jacinto to pick up one girl and then to Rogerson, Idaho to pick up another girl. We left Contact, drove to San Jacinto and picked up Wilma, who is Edna's sister. We then drove to Rogerson, Idaho and picked up a girl by the name of Delilia.

I don't know her last name and then we all started off toward Twin Falls, Idaho. We got there about 9 o'clock Saturday night. We let Johnny and Jimmy out in front of the St. Regis Club and made a deal to pick them up at midnight. We then drove to the Odd Fellows Hall where there was a dance. Stewart parked the car about a half a block from the hall. We got out of the car and started walking towards the hall, right next door to the Odd Fellows Hall is the American Legion Hall. All of the party, excepting me, stopped to look at a new Tucker automobile. I went on along to the dance and told them I would meet them later. After awhile the rest of them met me at the dance where we stayed until about 10 minutes to midnight. The dance usually let out at midnight. Al and Stewart left and went looking for Jimmy and Johnny. The girls and myself went to where the car was parked or where it had been parked. When we didn't find the car we went back to the front of the Odd Fellows Hall and waited. In a few minutes Stewart and Al drove up. The girls and myself got in and we all started back to Contact, Nevada. While we were going out of Twin Falls I was making quite a bit of noise. Al told me to shut up and it made me mad. We drove on until we got to Contact, Nevada where we drove up to the front of Edna's house where Al, Edna, Delilia and Wilma got out.

"On leaving Alazon I had taken with me a coat and a .32 automatic, which was fully loaded and was in the pocket of this coat. I took it with me because Al and I had made plans that I would stay in Contact and on Sunday morning we would go hunting.

"When we got to Contact and everyone got out but Stewart and myself I put my coat on and got in the front seat with Stewart. We took off from Contact at about 2 or 2:30 a. m. Sunday morning on October 10, 1948. When we got out of Contact about four miles I asked Stewart to stop the car because I had to urinate. He stopped the car and I got out and urinated. When I had finished I half got into the car, took the .32 out of

my pocket and shot him through the right side of his face. He sat there for a minute then got out and walked toward the front of the car in front of the car and over to the right front fender then walked back to the left side of the car and got in. When he got into the car I shot him the second time, this time through the chest. He sat there for a minute then fell toward the right side of the car. I got out and went around the car, got into the driver's seat and let the car coast a little ways. I then stopped the car. When I stopped the car he sort of sat up and fumbled with the door and got out. I got out and went around to his side there and he had gotten out of the car and walked about five feet off the right hand side of the highway, where I took hold of him and he sort of walked and moved when I pushed him for about ten feet more. Then he fell. I dragged him down to about 15 more feet I guess and shot him again on the left side of the head. There was a pile of rocks and I tumbled a few of them down by his legs and left him. I went back to the car and got in and drove down to Alazon. When I got to Alazon I went to where I lived and got some of my stuff put it in the car and started back out. When I had gotten out about a half a mile I ran out of gas. I walked back to Alazon looked around for gas and went into the pump house, got some gas, walked out to the car, put the gas in the car and drove to Wells. I stopped at a service station on the highway in Wells where I had the car filled with gas, then started driving back towards Contact. When I had gotten as far as Wilkins I turned off on the dirt road which goes into Loomis pasture, drove a few miles and had a flat tire. I tried to fix the tire but I couldn't so I stayed there until about 3:30 in the afternoon. I fixed myself a lunch, looked into the glove compartment, took the seat covers off the seat, which were covered with blood and threw them out in the brush near the car. At about 3:30 I walked to Wilkins and bought myself a bus ticket for the Mineral Hot Springs. I stayed there until bus time which was about 5:30. I left there on the bus went to

Mineral Hot Springs. I got there about 6:30 Sunday night, got myself a sandwich, took a bath and stayed there for the dance. I remained there until I was put under arrest by the officers from Wells and Elko. After I shot him the third time I took everything off of him including his wallet, money, title to the car, car keys and a watch.

"When the officers picked me up they found my wallet but it had Stewart's stuff in it. The rest of Stewart's stuff I scattered around the car.

"The foregoing statement, which consists of 2 and three quarter pages is the truth, and the whole truth. It was made by me, the undersigned, Richard Lindley Boudreau, also known as Dick Bays, freely and voluntarily, without promise of reward, without any duress, fraud or undue influence and of my own free will with full knowledge that the same could be used against me and after reading the same and signing each page I, thereafter signed it in the presence of Homer Murphy, Constable of Wells and Russell R. Plank, inspector of the Nevada State Police, at Wells, Nevada at four minutes after eight o'clock p. m. on the 11th day of October, 1948. (Signed) Richard Lindley Boudreau. Witnesses: (Signed) Russell R. Plank, Insp. NSP. (Signed) Homer Murphy."

In reply to a question by the district attorney, Constable Murphy testified as follows: "You informed the defendant that he was entitled to a lawyer. That if he talked that it had to be voluntary. That you would use no threats or promise any rewards. If he done it, he would have to do it voluntarily, which he did. You asked him if he wanted to talk and he said, 'Yes' and proceeded with his statement." He further testified that no promise of reward was made to the defendant, and that no threats were made, that no coercion or force was used, and that the defendant read the statement very slowly and carefully and then signed it.

■ The defendant did not take the witness stand in

his own behalf. His counsel contend that the confession was not voluntary in that, due to lack of proper food and rest, his physical condition did not allow of independent and voluntary action on his part. The only testimony given on this subject is that of Constable Murphy, which testimony tends to show that the defendant had proper food and rest during the time elapsing after the return from the scene of the homicide and to the time of the confession. We conclude that there was ample evidence to justify the trial court in submitting to the jury the facts and circumstances surrounding the making of the confession, together with the confession itself.

In urging that the trial court erred in admitting the confession, defendant's counsel argue that the confession was obtained while the defendant was under illegal detention, and they cite and rely on the federal rule on the subject as established by the decisions of the Supreme Court of the United States. The decisions referred to are McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, and Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170. The federal doctrine is stated, in the language of Mr. Justice Black in the Upshaw case, 335 U.S. 412, 413, 69 S.Ct. 171, 172, as follows: "We hold that this case falls squarely within the McNabb ruling and is not taken out of it by what was decided in the Mitchell case. * * * The Mitchell case, 322 U.S. at page 68, 64 S.Ct. (896), at page 898 (88 L.Ed. 1142), however, reaffirms the McNabb rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological', * * * The argument was made to the trial court that this method of arresting, holding, and questioning people on mere suspicion, was in accordance with the 'usual police procedure of questioning a suspect

**46**

* * *.' However usual this practice, it is in violation of law, and confessions thus obtained are inadmissible under the McNabb rule. We adhere to that rule."

In the Upshaw case, a dissenting opinion was rendered by Mr. Justice Reed, joined in by Chief Justice Vinson and Justices Jackson and Burton, taking the view that illegal detention alone, even for the purpose of obtaining information, should not be sufficient to justify the exclusion of a confession to police officers. Speaking for the minority view, Justice Reed said: "The judicial approach to the problem, of course, must be in a spirit of cooperation with the police officials in the administration of justice. They are directly charged with the responsibility for the maintenance of law and order and are under the same obligation as the judicial arm to discharge their duties in a manner consistent with the Constitution and statutes. The prevention and punishment of crime is a difficult and dangerous task, for the most part performed by security and prosecuting personnel in a spirit of public service to the community. Only by the maintenance of order may the rights of the criminal and the law abiding elements of the population be protected. As has been pointed out by this Court in the McNabb and Mitchell cases, United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, there is no constitutional problem involved in deciding whether a voluntary confession given by a prisoner prior to commitment by a magistrate should be admitted in evidence. A prisoner's constitutional rights against self-incrimination or to due process are protected by the rule that no involuntary confession may be admitted. McNabb v. United States, supra, 318 U.S. at pages 339, 340, 63 S.Ct. (608) at page 612, 87 L.Ed. 819, (823, 824) and cases cited; Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, (92 L.Ed. 224) ; Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192."

In the Upshaw decision, the inadmissibility of the confession was based on rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides that "An officer making an arrest   *   *   *   shall take the arrested person without unnecessary delay before the nearest available" committing magistrate, and when the arrested person appears before the magistrate "a complaint shall be filed forthwith." The comparable provision of Nevada law is N.C.L., section 10744, which provides that "The defendant must, in all cases, be taken before the magistrate without unnecessary delay." In 22 C.J.S., Criminal Law, sec. 817, p. 1431, the following is stated: "Matters which do not affect the voluntary character of a confession do not render it inadmissible as involuntarily made. A confession is not rendered inadmissible merely by the fact that it was obtained during an undue delay between arrest and the time when accused was brought before the court."

In 20 Am.Jur., Evidence, p. 432, section 499, the following is stated: "The mere fact that there was an illegal delay in the arraignment of the prisoner will not render a confession involuntary and inadmissible, even though the delay is for the purpose of obtaining a confession. However, the fact of an illegal delay for no apparent reason except that the police need a confession in order to have competent proof of the crime is a matter to be considered in determining whether the confession was given voluntarily."

The two excerpts just quoted, written before the supreme court adopted the McNabb rule, reflect the doctrine prevailing in a number of the states as established by their highest courts. In the dissenting opinion in the Upshaw case, it is said that "State courts under similar laws and conditions have refused to follow the McNabb example," and, in a footnote, the following cases are cited: "Fry v. State, 78 Okl.Cr. 299, 147 P.2d 803, 810, 811; State v. Folkes, 174 Or. 568, 150 P.2d 17, 25; State v. Smith, 158 Kan. 645, 149 P.2d

600, 604; People v. Malinski, 292 N.Y. 360, 55 N.E.2d 353, 357, 365; State v. Collett, Ohio App., 58 N.E.2d 417, 426, 427; State v. Nagel, N.D., 28 N.W.2d 665, 679; State v. Ellis, 354 Mo. 998, 193 S.W.2d 31, 34, [37]; Finley v. State, 153 Fla. 394, 14 So.2d 844; State v. Browning, 206 Ark. 791, 178 S.W.2d 77, 78–80; Russell v. State, 196 Ga. 275, 26 S.E.2d 528, 534."

In the case of State v. Carrick, 16 Nev. 120, this court said:

"It is only in cases where the confession is obtained by mob violence, or by threats of harm, or promises of favor or worldly advantage held out by some person in authority, or standing in such intimate relation from which the law will presume that his promises or threats will be likely to exercise such an influence over the mind of the accused as to induce him to state things that are not true, that will authorize the courts to exclude the confession or admission.

"The law in its general application to this question, as well as others, is founded in reason and common sense. Its object is to ascertain the truth, and it is not its purpose to reject any reliable and competent means of attaining it."

In the case of State v. Mircovich, 35 Nev. 485, 130 P. 765, this court said: "It is contended that the court erred in admitting certain statements and admissions in the nature of a confession made by defendant to certain officers in Nye county shortly after the assault and while he was in custody. The proof shows that these statements were made voluntarily by the defendant, and without the use of force, threats, inducements, or promises, or hope of reward; but there is no showing that, previous to making such statements, the officers having defendant in custody informed him that, if he made any statements, they might be used against him. This assignment of error is without merit * * *."

In the case of State v. Wilson, 39 Nev. 298, 156 P. 929, this court said: "It requires no citation of authority, as we view it, to support the assertion that before

the statement or series of answers made by the defendant in the police headquarters while he was under arrest charged with the offense could have been admitted as a part of the state's case in chief, it would have been necessary to lay a foundation for its admissibility, showing that the statement was voluntary, and that the same was made without hope of reward, inducement, or fear of punishment. State v. Dye, 36 Nev. 143, 133 P. 935, and cases there cited."

The case of State v. Hall, 54 Nev. 213, 13 P.2d 624, dealt with an oral confession, and it was urged on behalf of defendant that his maudlin condition as the aftermath of excessive drinking rendered his statements involuntary. This contention was rejected by this court, and the court added, "All of the witnesses testifying to appellant's statements said that no inducements or rewards were offered to appellant, or threats made to induce him to confess the killing. The statements were properly admitted for the consideration of the jury."

■ In the cases just referred to, it is seen that this court has followed the rule that the voluntary character of a confession is the chief test of its admissibility. We have concluded that this rule should be adhered to in cases where, as in the instant case, the confession is made while the defendant is under arrest and prior to his presentation before a magistrate, and though the detention shall have become unlawful.

It is true that the practice of interrogating prisoners by police officers is frequently abused. In dealing with this problem, Professor Wigmore sums up his views on the subject as follows: "But, it is argued, there are abuses by the police. Very true,—here and there, at least. It does not follow, however, that a stricter rule of exclusion of confessions is the proper remedy. It is still a misguided remedy. The first remedy is to improve police personnel. The second one is to provide a means of speedy confession which shall be less susceptible of abuses, while still taking advantage of the inherent psychological situation. In short, let an authorized

skilled magistrate take the confession. Let every accused person be required to be taken before a magistrate, or the district attorney, promptly upon arrest, for private examination; let the magistrate warn him of his right to keep silence; and then let his statement be taken in the presence of an official stenographer, if he is willing to make one." 3 Wigmore on Evidence, 3d ed., sec. 851, at page 319.

■ The circumstances of the questioning of the defendant in this case, at the jail, in the middle of the night and in the presence of a brother of the deceased, raise a conjecture of possible coercion. However, after time for rest and reflection, the defendant, under conditions similar to those advised by Wigmore, made and signed his detailed confession. The proof of the possibility of coercion in the first instance is, as we view it, overcome by the showing of lack of coercion when the confession was reduced to writing. See 22 C.J.S. Criminal Law, sec. 835, at page 1460.

While appreciating the reasoning and purpose of the recent decisions of our highest national tribunal on the problem relating to confessions, and entertaining for that court the highest respect, we are constrained by the reasoning of the minority view as well as that of a number of the state courts which have already exercised the right of the states to deviate from the doctrine of the federal cases referred to. In Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 1254, 92 L.Ed. 1690, the supreme court said: "The plea for relief because he was detained as he claims, unlawfully is based on McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. But the rule there applied was one against use of confessions obtained during illegal detention and it was limited to federal courts, to which it was applied by virtue of our supervisory power."

We consider that the rule which we are following is in accord with the principles of the common law and is adapted to the needs of the law enforcing branch of the state government. The rule does not preclude the

belief that progress should and will be made toward the elimination of the abuses referred to.

■ Defendant's counsel contend that the formal language used in the introductory paragraph of the confession precludes a belief that the paragraph was dictated by the defendant. It is also urged that Constable Murphy having testified that the defendant dictated the language of the paragraph referred to, his entire testimony as to the giving of the confession is discredited and hence the confession should have been rejected. The general rule is that a confession is admissible although not in the exact words of the accused, where it was read by the accused and signed or otherwise admitted by him to be correct. 22 C.J.S., Criminal Law, sec. 833, at page 1455, and cases cited. In State v. Brasseaux, 163 La. 686, 112 So. 650, 654, the supreme court of Louisiana said: "While the introductory paragraph was not dictated by defendant, it was read to him by the assistant district attorney, before defendant signed the confession, and defendant acquiesced in the statement without objection."

It was for the jury to determine as to the truth or falsity of any portion of the testimony of the witness and as to the effect of falsity on other portions of his testimony, and they were so instructed by the court. They were also properly instructed as to the manner in which they should consider and weigh the confession. With the confession properly before them and evidently relying on its statements, the jury brought in their verdict of murder of the first degree.

It is urged on behalf of defendant that "No evidence of any kind was developed indicating a criminal background of the defendant, nor was any evidence developed indicating a purpose, plan or set of facts which might establish a motive or a wilful and deliberate act." It is argued that, in this situation, wilfulness and premeditation could only be inferred from the facts surrounding the death, rather than from facts establishing the reason for the death. As to the accompanying facts, the

jury had before them, in addition to the confession, the circumstances connected with the crime substantially as stated above. It will be noted that, in the confession, the defendant stated that, at his request, Stewart stopped the car and defendant got out of the car to urinate and that, while reentering the car, he took the pistol from his pocket and shot Stewart through the right side of the face, that Stewart sat there for a minute and then got out and walked toward the front of the car and over to the right front fender, then walked back to the left side of the car and got in; that when Stewart got into the car he shot him the second time, this time through the chest; that Stewart sat there a minute and then fell toward the right side of the car; that he, the defendant, got out and went around the car, got into the driver's seat and let the car coast a little way, when he stopped the car and Stewart sat up, fumbled with the door and got out; that defendant got out and went around to Stewart's side of the car, the latter having walked about five feet off the right hand side of the highway; that he took hold of Stewart and, defendant's statement continues, "he sort of walked and moved when I pushed him for about ten feet more, then he fell; I dragged him down to about 15 more feet I guess and shot him again on the left side of the head; there was a pile of rocks and I tumbled a few of them down by his legs and left him."

■■ Motive is not an essential element of murder and need not be proved to sustain a conviction, if the other evidence is sufficient. 41 C.J.S., Homicide, sec. 318, p. 31. The record shows no provocation on the part of the deceased towards the defendant. The sequence of events and the intervals, from the firing of the first shot until the last shot was fired, allowed time for deliberation and premeditation and the forming of a design to kill. The repeated shooting of the deceased indicated such a design. In dealing with the subject of deliberation and premeditation in the case of State v. Gregory, 66 Nev. 423, 212 P.2d 701, this court quoted the rule on the

subject as set forth in 26 Am.Jur., Homicide, 187, sec. 42, as follows: "When a design is once formed, the haste with which it is put into execution in no way affects or modifies the degree of guilt incurred. Such design may have existed for only an instant before the commission of the crime. Deliberation and premeditation imply a capacity at the time of the commission of the homicide to think and reflect—sufficient volition to make a choice, and by use of the mental powers, to refrain from doing the homicidal act."

■ As we view the facts disclosed, the jury had before them substantial evidence from which they could reasonably infer express malice, "the deliberate intention unlawfully to take away the life of a fellow creature" (N.C.L., sec. 10067) and that the defendant acted upon deliberation and premeditation.

■ With reference to the suggestion that this court modify the judgment by reducing the degree of the crime, we need do no more than refer to State v. Robison, 54 Nev. 56, 6 P.2d 433. In that case application was made to this court to modify the judgment of second-degree murder to one of manslaughter. The court, speaking through DUCKER, J., said: "The evidence is, we think, sufficient to support the verdict of murder of the second degree. Consequently we could not reverse the judgment on the ground of insufficiency of the evidence, nor are we authorized by statutes of 1931 to modify the judgment to one of manslaughter. The statute does not purport to clothe the court with power to modify a judgment in a criminal case without giving or ordering a new trial, as a matter of leniency, but only when the judgment is not supported by the evidence which does show the defendant guilty of a lesser degree of the crime for which he was convicted, or of a lesser crime included therein. There was, however, as we have indicated, evidence upon which the jury could legally base a verdict of murder."

No error appearing, the judgment and the order denying defendant's motion for a new trial are hereby

affirmed, the application for modification of the judgment by reducing the degree of the crime is hereby denied, and the district court is directed to make the proper order for carrying into effect, by the warden of the state prison, of the judgment rendered.

HORSEY, C. J., and BADT, J., concur.

EATHER, J., being absent on account of illness, the Governor designated Honorable WM. D. HATTON, judge of the Fifth Judicial District, to act in his place.