[No. 2547]

# THE STATE OF NEVADA, Respondent, v. GEE JON and HUGHIE SING, Appellants.

[211 Pac. 676]

1. Criminal Law—Confession Involuntary if Accused Told by Officers that He Would Be Released if He Made Statement.

If one accused of murder is told by the officers that he will be turned loose if he makes a statement, a confession so made is involuntary and inadmissible.

2. Criminal Law—Confession after Adjuration by Officers to Tell the Truth Held Not Involuntary.

Where one accused of murder confessed, after being told by the officers that it would be better for him to tell the truth, the confession was not inadmissible as involuntary.

3. Criminal Law—Admission of Pistols Found in Automobile Held Not Error.

In a prosecution of two Chinamen for the murder of a third, it was not error to admit in evidence two pistols, found in the automobile in which the trip to the place of the commission of the crime had been made, in view of uncontradicted testimony showing the presence of defendants at that place at the time of the killing, and of certain tracks and other evidence.

4. Criminal Law—Admission and Interpretation of Receipts in Possession of Defendant Not Error, where Defendant's Counsel Stated He Had No Objection.

In prosecution of two Chinamen for the murder of a third, no error was committed in admitting in evidence certain receipts. found in the possession of one of the defendants, nor as to permitting an interpretation thereof, where defendant's counsel stated at the time, "We have no objection."

5. Criminal Law—Admission of Photograph Showing Place of Shooting Held Harmless Error.

In prosecution for murder, admission in evidence of a photograph showing a portion of the room in which deceased was standing at the time of the shooting, if error, held not prejudicial.

6. Criminal Law—Remarks of State's Counsel in Argument as to Tong Wars Held Improper, but Harmless.

In a prosecution of two Chinamen for the murder of a third, remarks of state's counsel, in argument relative to tong wars, in the absence of evidence connecting defendants with them, held improper, but not prejudicial.

7. Homicide—Instruction as to First-Degree Murder Held Not Erroneous.

An instruction that certain kinds of murder carry with them evidence of premeditation and deliberation; that the legislature has enumerated these in the statute, and has taken

upon itself the responsibility of saying that they shall be
deemed murder in the first degree; that these cases are of
two classes, first, where the killing is perpetrated by means
of poison, or lying in wait, or torture, or of any other kind of
wilful, deliberate, and premeditated killing, "and here the
means used is held to be evidence of premeditation and
deliberation"—*held* not error.

8. CRIMINAL LAW—INSTRUCTION AS TO PRESUMPTION OF INNOCENCE
AND BURDEN OF PROOF HELD NOT ERRONEOUS.

In a prosecution for murder, instruction that the rule of law
which throws around defendants the presumption of inno-
cence, and requires the state to establish beyond a reasonable
doubt every material fact averred in the indictment, is not
intended to shield those who are actually guilty from just
and merited punishment. but is a humane provision of the
law, which is intended for the protection of the innocent and
to guard, so far as human agencies can, against the conviction
of those unjustly accused of crime, *held* not to violate the
rights of the defendants.

9. CRIMINAL LAW—INSTRUCTION AS TO FIRST-DEGREE MURDER
WHICH OMITTED THE WORDS, "UNLAWFULLY AND WITH MALICE
AFORETHOUGHT" HELD NOT ERRONEOUS, WHERE THE COURT
GAVE IN ITS INSTRUCTIONS THE STATUTORY DEFINITION OF
MURDER, AND WHERE NO SUBSTANTIAL ERROR RESULTED.

In a prosecution for murder, an instruction that. if the
jury believed that defendants went to the place where deceased
resided, "with the wilful and deliberate and premeditated pur-
pose of taking his life, and that said defendants with such
intent shot and killed the deceased, then and in that event the
defendants are guilty of murder in the first degree," *held*
not erroneous as failing to advise the jury that they must
find the killing to have been unlawful and with malice afore-
thought, in view of all the facts in the case, and the broad
statute to the effect that no judgment in a criminal case
should be reversed for a misdirection of the jury. when no
substantial error results. and that the court gave in its instruc-
tions the statutory definition of murder.

10. CRIMINAL LAW—MOTION FOR SEVERANCE HELD INSUFFICIENT AS
STATING MERE CONCLUSIONS.

In a prosecution of two defendants for murder. a motion
for severance, merely stating that certain admissions or state-
ments made by one of the defendants, prejudicial in their
nature to movant. would be introduced in evidence. *held*
insufficient as stating a mere conclusion.

11. HOMICIDE—CONVICTION OF MURDER SUSTAINED.

In a prosecution of two Chinamen for the murder of a
third, evidence relating to a journey of defendants to the
place of the killing in a jitney, as to their explanation of
their absence. footprints, and pistols in the jitney, and as to
defendants' reasons for making the return trip. *held* sufficient
to sustain a conviction.

Points decided

12. CRIMINAL LAW — EXECUTION BY GAS · HELD NOT CRUEL OR UNUSUAL PUNISHMENT.

Stats. 1921. p. 387. authorizing execution of persons convicted of murder in the first degree by the use of lethal gas, *held* not to violate the federal and state constitutions as to cruel and unusual punishments.

13. CONSTITUTIONAL LAW — LEGISLATIVE ENACTMENTS MUST BE DEEMED CONSTITUTIONAL UNTIL CONTRARY CLEARLY SHOWN.

Every enactment of the legislature must be deemed in harmony with the constitutional provisions until the contrary clearly appears.

14. CRIMINAL LAW — STATUTE AS TO EXECUTION OF DEATH PENALTY BY USE OF LETHAL GAS HELD NOT INDEFINITE AND UNCERTAIN.

Stats. 1921, p. 387. directing the execution of a judgment of death by administration of lethal gas, and prescribing that a suitable and efficient enclosure, and proper means for the administration of such gas for the purpose, shall be provided, *held* not indefinite and uncertain.

ON SECOND PETITION FOR REHEARING

1. CRIMINAL LAW — SUPREME COURT WILL NOT ENTERTAIN SECOND PETITION FOR REHEARING.

Under supreme court rule 15 the supreme court will not entertain a second petition for rehearing in criminal cases.

2. CRIMINAL LAW — SUPREME COURT RULE RELATING TO PETITIONS FOR REHEARING APPLICABLE TO CRIMINAL CASES.

Supreme court rule 15 relating to petitions for rehearing is applicable in criminal as well as civil cases.

3. CRIMINAL LAW — POINT NOT PREVIOUSLY URGED NOT CONSIDERED ON PETITION FOR REHEARING.

A point not urged when the case was first called to the attention of the court will not be considered on petition for rehearing.

APPEAL from Seventh Judicial District Court, Mineral County; *Emmett J. Walsh,* Judge.

Gee Jon and Hughie Sing were convicted of murder, and they appeal. **Affirmed. Petition for rehearing denied. Second petition for rehearing denied.**

NOTE—The point raised on the second or supplemental petition for a rehearing was that the title of Stats. 1921, p. 387, under which the sentence of death by lethal gas was imposed, entitled "An act to amend an act entitled 'An act to regulate proceedings in criminal cases in this state, and to repeal all other acts in relation thereto,' approved March 17, 1911," approved

March 28, 1921, does not set forth the subject sought to be legislated upon in such manner as to fairly give notice of the actual enactment, and that the act does not contain but one subject and the matters properly connected therewith clearly expressed in the title.

*Frame & Raffetto* and *Thos. J. D. Salter*, for Appellants:

Severance should be allowed where one defendant makes confession involving the other. State v. McLane, 15 Nev. 345; State v. Johnny, 29 Nev. 203.

Confessions must be voluntary. State v. Wilson, 39 Nev. 298. Confession not admissible if defendant told "it would be better for him to tell the truth," or where officers promise to "turn him loose." State v. Dye, 36 Nev. 143; State v. Urie, 35 Nev. 268.

Photographs showing conditions other than those caused by defendant are inadmissible. State v. Roberts, 27 Nev. 449.

It is error to admit pistol in evidence, where sole foundation rests upon involuntary confession of one defendant, or where pistol was found in automobile some time after defendants left car in control of others or for a time unattended.

Definition of first-degree murder, concluding with words "and here the means used are held to be evidence of premeditation and deliberation," invades province of jury, being an expression by court of ultimate conclusion. State v. Pappas, 39 Nev. 40. Any ambiguity which may mislead jury is ground for new trial. State v. McGinnis, 5 Nev. 337; State v. Ferguson, 9 Nev. 114.

An instruction that the presumption of innocence is not intended to shield the guilty, but to protect the innocent, is erroneous, since the presumption of innocence attends every accused person. State v. Duffy, 6 Nev. 138.

An instruction that taking life with wilful and deliberate intention constitutes first-degree murder, but omitting therefrom "unlawfully" and "with malice

aforethought," is erroneous. State v. Vaughn, 22 Nev. 299.

Death by lethal gas is a cruel and inhuman punishment prohibited by state and federal constitutions. Nothing being provided as to kind, mode or means of application, the statute is void for uncertainty.

The law under which the penalty is imposed (Stats. 1921, p. 387) is unconstitutional because the title does not clearly express the subject; does not contain but one subject and matters properly connected therewith clearly set forth in the title. Ex Parte Cerfoglio, 46 Nev. 332.

A second petition for rehearing may be filed to correct palpable error or grievous wrong (Trench v. Strong, 4 Nev. 589; Ward v. Pittsburg Silver Peak G. M. Co., 39 Nev. 103; Brandon v. West, 29 Nev. 142, dissenting opinion; 23 Cyc. 859), even though raising a point for the first time, as this court has jurisdiction until the remittitur is sent down. Rev. Laws, 7307.

L. B. Fowler, Attorney-General; Robert Richards, Deputy Attorney-General; J. H. White, District Attorney; and Geo. Green, for Respondent:

The granting or refusing of separate trials is in the discretion of the court. Stats. 1921, p. 165, is not ground for reversal unless such discretion is abused. Territory v. Clark, 99 Pac. 697; 16 C. J. 784, sec. 2006, note 68.

It is not error to deny a separate trial where the court limits the confession made by one defendant to him alone. State v. McDaniels, 196 Pac. 177, 16 C. J. 787, sec. 2009; Ball v. U. S., 163 U. S. 662, 672; Commonwealth v. Blingham, 33 N. E. 341; People v. Hotz, 103 N. E. 1007, 1014.

The question of the voluntariness of a confession is to be decided by the court. If admissible, it is not improper to summit all the evidence to the jury. State v. Williams, 31 Nev. 360; 16 C. J. sec. 1468; State v. Carrick, 16 Nev. 120; Hopt v. People, 110 U. S. 574; State v. Milosovich, 42 Nev. 263.

Telling a prisoner that it will be better for him to tell the truth can hardly be interpreted by him to make an untrue confession. Wilson v. State, 19 Ga. 759; 16 C. J. 720; Reagan v. People, 112 Pac. 785; Hintz v. State, 125 Wis. 405.

The defendants cannot contest the point sought to be illustrated by the photographic diagram, for that is immaterial to them, since they assert they were not present at the house of the decedent at all, and had no connection with or knowledge of the homicide. State v. Clark, 196 Pac. 371; State v. Finch, 105 Pac. 505.

The instructions on premeditation and deliberation were fair and fully cover the law (State v. Millain, 3 Nev. 409; State v. Mook, 12 Nev. 369; State v. Lopez, 15 Nev. 407), as also were those on malice and motive. Blanda v. People, 189 Pac. 249; People v. Durant, 116 Cal. 179; State v. Vaughn, 22 Nev. 300; State v. Hymer, 15 Nev. 53; Thomason v. Territory, 13 Pac. 223.

It is not the duty of the supreme court, nor of the state, to comb the record for error. It is the duty of defendant's counsel to point out the alleged error with definiteness. State v. Willberg, 45 Nev. 183; People v. Kruvosky, 200 Pac. 832.

The infliction of the death penalty by the administration of lethal gas is not prohibited by the constitution of the United States, as it operates only in cases arising under the laws of the United States. McNulty v. People, 93 Cal. 427; In Re Kemmler, 34 L. Ed. 519.

The Supreme Court of the United States follows the adjudication of the highest court of a state in the construction of its statutes. McElvain v. Brash, 142 U. S. 155, 35 L. Ed. 972.

It is the legislature, and not the court, which is to define a crime and ordain its punishment. U. S. v. Wilkberger, 5 L. Ed. 37, 42; State v. Becker, 3 S. D. 29. But the court has no right to say that the punishment is cruel and unconstitutional, unless it clearly so appears. Harper v. Commonwealth, 93 Ky. 290.

The interdict of the constitution against cruel and unusual punishment applies to such as amount to torture (State v. Williams, 77 Mo. 310); but was not

intended to limit the selection of the kind of punishment deemed most effective in the suppression of crime. Garcia v. Territory, 1 N. M. 415.

The eighth amendment to the constitution is not a restraint upon and cannot apply to the legislature of a state, but only to the national legislature. Foote v. State, 59 Md. 264, 267; Perveur v. Mass., 72 U. S. 479, 18 L. Ed. 609; O'Neil v. Vermont, 144 U. S. 323, 36 L. Ed. 450; Commonwealth v. Murphy, 165 Mass. 66.

. The same objection was made against electrocution in New York, but was held for naught.

The officials in charge of the execution have the right to select a punishment without torture that is not unusual nor cruel, and is expeditious. 16 C. J., p. 1378, secs. 3250, et seq., particularly sec. 3253.

Hanging was not the only mode of execution, and in the absence of any controlling statute, it would seem that other modes may be resorted to as long as the prohibition against cruel and unusual punishments is not violated. Wilkerson v. Utah, 99 U. S. 130; Hartung v. People, 22 N. Y. 95.

The second or supplemental petition for rehearing should be denied because: The court has fully considered one such petition; the grounds alleged have not been presented before, and the title to the act mentioned is sufficient and the act is, therefore, constitutional. Trench v. Strong, 4 Nev. 87; Brandon v. West, 29 Nev. 135; Vickers v. Vickers, 45 Nev. 274; 17 C. J. sec. 3533; People v. Krueger, 86 N. E. 617; 25 R. C. L. 870, 871, 872; 35 Cyc. 1058–1059; 36 Cyc. 1058; People v. Parvin, 16 Pac. 490; Yellow River Imp. Co. v. Arnold, 49 N. W. 971; Ward v. Silver Peak G. M. C., 39 Nev. 80; 17 C. J. 201.

By the Court, COLEMAN, J.:

The appellants were convicted in the district court of Mineral County upon a charge of murder, alleged to have been committed therein, and were sentenced to suffer the death penalty. A motion for a new trial and

for an arrest of judgment having been denied, an appeal was taken to this court.

The facts of the case as shown by the testimony of the state, and which the jury must have found to be true, are:

About 8 o'clock on the morning of August 28, 1921, a Chinaman known as Tom Quong Kee was found dead in his cabin at Mina, Mineral County, Nevada, with a bullet hole through his body. About a week before the defendants had spent one day in Mina. On the evening of the 26th of August, defendant Sing engaged one Pappas, of Reno, Nevada, a taxi driver, to take him and the other appellant on the next day to Tonopah. They left Reno in the morning, going by way of Virginia City, Yerington, and Hawthorne, and arrived at a point about a mile out of Mina around 8 or 9 o'clock in the evening. At that point Sing, who could speak English, directed Pappas to pull out of the road and await the return of the defendants, who left the car and walked in the direction of Mina. Pappas fell asleep, and was awakened about 10 o'clock by the horn of a passing car. Not having had anything to eat that day, except a glass of milk, which was in the morning, he started to drive to Mina to procure food. Meeting the defendants on the way, they got into the car, and proceeded toward town for a short distance, when Pappas was told to stop. After turning the car out of the road, he was given a dollar and directed to go into town and get some beer, which he did. He was gone thirty or forty minutes. Upon returning to the car he opened the beer, and each had two bottles, after which he was directed by Sing to return to Reno, where they arrived at 10 o'clock on the morning of August 28.

Upon discovery of the dead Chinaman on the morning of August 28, the deputy sheriff (Hamill) made an examination of the body and of the premises, and traced footsteps of two persons leading from the point at which the car stood when the beer was drunk to the cabin in which the Chinaman had been shot, and back

to the same point, after which he called up the chief
of police in Reno, informed him of the facts, and
requested him to arrest Pappas and the two defendants
upon their return to Reno, which was done shortly after
their arrival. The two defendants were placed in jail,
where the defendant Sing made a confession on the
evening of the same day.

As occasion may require, this skeleton of facts will be
supplemented in disposing of certain of the questions
presented.

It is contended that the court erred in admitting in
evidence the confession made by defendant Sing. This
contention is based upon the theory that the confession
was not voluntary, because one of the officers in whose
presence he made it told him to "tell the truth; that
the truth would be best for him." Counsel ·for the
appellants say in their brief:

"Aside from the positive statement of the defendant
Hughie Sing to the effect that they had promised to
turn him loose if he would make a statement, the testi-
mony of Officer Hamill, who was in fact in charge of
the case, and more particularly interested, it appears
undisputed that he told Hughie Sing that it would be
better for him to tell the truth, and that Chief of Police
Kirkley also made the same statement to Hughie Sing.
This places the case squarely within the rule announced
by this court in the cases of State v. Dye, 36 Nev. 143,
133 Pac. 935, State v. Urie, 35 Nev. 268, 129 Pac. 305,
and State v. Carrick, 16 Nev. 129."

1, 2. We readily concede that if Sing was told by the
officers that he would be turned loose if he made a state-
ment, the confession would be involuntary, and that it
should have been excluded. The fact is that Sing made
his confession in the presence of Chief of Police Kirkley,
Deputy Sheriff Hamill, and Police Officer Dean, all of
whom deny that any such statement was made as testi-
fied to by the defendant Sing, to the effect that he would
be turned loose if he made a statement. The lower
court had a right to reject the statement of Sing, which

it no doubt did—at least, we presume that it did. This leaves for our consideration whether the statement of the officers, under the facts and circumstances surrounding the making of the confession—that it would be better for the defendant to tell the truth—was such as to justify this court in saying that the confession was involuntary.

In the case of State v. Dye, 36 Nev. 143, 133 Pac. 935, it was held that the statement by the officer to the defendant, "If you tell the truth, it will be a whole lot better for you," under all the facts and circumstances of the case, was sufficient to warrant the conclusion that the confession was not voluntary. But it appears from the statement of the facts of that case that there were other elements entering into consideration which materially influenced the court in holding that the confession was involuntary. It appears that the defendant was considered as a tool of others, and that he was made to believe that he was so considered by the prosecuting witness and the sheriff, who said to him:

"Bill, you watch out for Bill Dye.   *   *   *   Bill, you ain't to blame. It is others I blame. It is better for you to take care of yourself.   *   *   *   Bill, I want the principals in this proposition. It wouldn't do me much good to send you to prison, for they could hire some one to do the job again. Bill, I want the head man in this."

The foregoing is but part of the facts of that case going to show that there was influence brought to bear upon the defendant to justify the court in holding the confession involuntary. There is no such situation in this case. The testimony on the part of the state showed that on the evening of August 29 the defendant, who was in the city jail at Reno, was taken into the presence of Chief of Police Kirkley, Deputy Sheriff Hamill of Mineral County, and Officer Dean. Chief Kirkley stated to him that he wanted to talk with him, and told him that anything he might say could be used against him in court; that it would be best for him to

tell the truth. He then asked him, "How did you come to get mixed up in this?" to which he replied, "Oh, I have been drinking." The testimony on the part of the state is also to the effect that no threats of violence or promises of immunity were offered, and that the defendant seemed perfectly composed and calm. Thus it appears that the defendant had notice that anything he might say could be used against him in court. It was a warning to him. He knew from this statement that he could expect no immunity. Then, does the mere statement that it would be better for him to tell the truth necessitate a conclusion that the confession was involuntary?

The basis of the rule assigned for the exclusion of confessions made as the result of promises or threats is the unreliable character of the confessions made under such influences. The rule rests entirely upon the theory that confessions given under such influences are improbable. Counsel say that it is based upon the theory that a person charged with a crime shall not be compelled to be a witness against himself. Whether a witness who makes a confession can be said to be a witness against himself turns upon the proposition as to whether or not the confession is voluntary. In Huffman v. State, 130 Ala. 89, 30 South. 394, it was said:

"It does not render a confession inadmissible to charge a defendant with crime before he confesses it, nor to tell him it will be better for him to tell the truth, if he is guilty [citing authorities]."

It was held in Hintz v. State, 125 Wis. 405, 104 N. W. 110, that a judgment would not be reversed where a confession was admitted upon the representation to the defendant:

"You might as well tell the truth, Charlie. I think it would be better for you."

The Criminal Court of Appeals of Texas, in Anderson v. State, 54 S. W. 581, held that the statement to a defendant "that it might be better for her to tell the truth about it" did not warrant a reversal of conviction.

In State v. Brown, 2 Boyce (25 Del.) 405, 80 Atl. 146, it was held that a confession should not be excluded merely because the defendant was told:

"Tell us the truth; it will be better for you."

In Lucasey v. United States, Fed. Cas. No. 8,588a, it was held that a confession was admissible in which the defendant was told that "it would be better for him to tell the truth."

The Court of Appeals of Georgia, in Wilson v. State, 19 Ga. App. 759, 92 S. E. 309, held that a statement to the defendant that "it would be better for him to tell the truth about the case" would not justify the exclusion of a confession.

In State v. Meekins, 41 La. Ann. 543, 6 South. 822, it was held that the fact that the sheriff told the defendant "he had better tell the truth" would not justify the exclusion of the confession.

In State v. General Armstrong, 167 Mo. 257, 66 S. W. 961, it was said:

"It is the settled law of this state that a mere adjuration to speak the truth does not vitiate a confession."

In State v. Allison, 24 S. D. 622, 124 N. W. 747, it was held that the statement by the sheriff to the defendant, "The best thing you can do is to tell the truth, and you might get out of it today," did not justify the exclusion of the confession from the jury.

The same rule was declared in Fouts v. State, 8 Ohio St. 98, State v. Kornstett, 62 Kan. 221, 61 Pac. 805, and Wilson v. State, 19 Ga. App. 759, 92 S. E. 309. See, also, 1 Greenleaf, Evid. (16th ed.), sec. 220; 2 Wharton, Crim. Evid. (10th ed.), sec. 647; 1 Wigmore, Evid. sec. 832.

While there are authorities taking the contrary view, the rule stated is sustained by the greater weight of authority, and, we believe, by the better reasoning.

3. The objection urged to the admission in evidence of two certain pistols, found in the automobile in which the trip to Mina had been made, is without merit. In view of the uncontradicted testimony showing the

presence of the defendants at Mina on the night of the killing, the tracks leading from the place of the killing to where the defendants drank the beer, and all the other evidence, we are of the opinion that the admission in evidence of the pistols was not prejudicial to the defendants.

4. The next point urged relates to certain receipts found in the possession of Gee Jon, offered in evidence by the state. They do not purport to be for money paid by either of the defendants. The theory of the state is that they were for money paid to a tong by the defendant Gee Jon. When they were offered in evidence, counsel for the defendants said: "We have no objections." In view of this statement, no error was committed by the court in admitting the receipts in evidence, and, being in evidence, no error could have been committed by the ruling of the court permitting their interpretation.

5. It is also contended that the court, in admitting in evidence a photograph showing a portion of the room in which the deceased was standing at the time of the shooting, with somewhat different conditions from those existing when the shooting was done, committed error. Technically speaking, the contention may be well founded, but under the facts of the case no possible prejudice would have resulted to the defendants, or either of them.

6. The remarks of special counsel for the state, during his argument, relative to tong wars, since there is nothing in the evidence connecting the defendants with them, were highly improper. Such remarks are unfair, and often lead to a reversal of a judgment of conviction and the burdensome expense of a new trial. A mere reprimand by the court, and an admonition to the jury to disregard such argument, do not always cure the injury. Trial courts should find some way of stamping out such gross abuses of the privileges of attorneys. However, we cannot say, in view of the entire record, that the defendants were prejudiced.

7.   Error is assigned to the giving of instructions 11, 13, and 26.   Instruction No. 11 reads:

"There are certain kinds of murder which carry with them evidence of premeditation and deliberation.   These the legislature has enumerated in the statute, and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder in the first degree.   Those cases are of two classes:  First, where the killing is perpetrated by means of poison, or lying in wait, or torture, or any other kind of wilful, deliberate and premeditated killing, and here the means used is held to be evidence of premeditation and deliberation."

This instruction was approved in the case of People v. Nichol, 34 Cal. 213, and was held by this court, in State v. Harris, 12 Nev. 414, to be devoid of error.   We think no error was committed by the giving of the instruction.

8.   Instruction No. 13 reads:

"The court instructs the jury that the rule of law which throws around the defendants the presumption of innocence and requires the state to establish, beyond a reasonable doubt, every material fact averred in the indictment, is not intended to shield those who are actually guilty, from just and merited punishment, but is a humane provision of the law, which is intended for the protection of the innocent, and to guard, so far as human agencies can, against the conviction of those unjustly accused of crime."

We fail to see wherein the rights of the defendants were violated by this instruction.   Similar instructions have often been sustained.   Turner v. State, 102 Ind. 425, 1 N. E. 869;  People v. Gerold, 265 Ill. 448, 107 N. E. 165, Ann. Cas. 1916A, 636;  People v. Rees, 268 Ill. 585, 109 N. E. 473.

9.   Instruction No. 26 reads:

"If you believe, from the evidence, beyond a reasonable doubt, the defendants   *   *   *   went to the place where Tom Quong Kee, deceased, resided, with the wilful and deliberate and premeditated purpose of taking his life, and that said defendants, with such intent,

shot and killed the deceased, then and in that event the defendants are guilty of murder in the first degree."

The objection urged to this instruction is that it does not advise the jury that they must find the killing to have been unlawful and with malice aforethought.

The court defined murder to be the unlawful killing of a human being, with malice aforethought, and followed that definition with an instruction substantially in the language of the statute, to the effect that all murder committed by means of poison, or lying in wait, torture, or any other kind of wilful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall be murder in the first degree; and that all other kinds of murder shall be deemed murder in the second degree. But the court nowhere informed the jury that, before they could find the defendants guilty of the crime charged, they must find that they unlawfully and with malice aforethought killed the deceased.

As to the merits of the contention made by counsel for the defendants, the court is somewhat divided. Mr. Justice SANDERS is of the opinion that, in view of the instruction defining murder, and of the other instruction as to the elements of wilful, deliberate, and premeditated killing, the court fully advised the jury as to the law of the case upon the particular phase in question, relying for support of his position upon the case of People v. Ye Foo, 4 Cal. App. 730, 89 Pac. 450, and People v. Mar Gin Suie, 11 Cal. App. 42, 103 Pac. 951; his theory being that by the instruction given the court was not defining murder, but expressly told the jury that, before they could find the defendants guilty of murder in the first degree, they must believe from the evidence beyond a reasonable doubt that the defendants went to the place with the preconceived, wilful, deliberate, and premeditated intent to take the life of deceased, and, with the intent thus formed, killed the deceased. On the other hand, Mr. Chief Justice DUCKER and the

writer are of the opinion that the essential elements of the crime of murder are the unlawful killing of a human being, with malice aforethought, and that the court erred in not embodying those elements in its instruction No. 26, or in some other instruction.

The Chief Justice, however, is of the opinion, in view of all the facts in the case and our broad statute to the effect that no judgment in a criminal case should be reversed for a misdirection of the jury when no substantial error results (as construed in State v. Willberg, 45 Nev. 183, 200 Pac. 476), that, as the court gave in its instructions the statutory definition of murder, no prejudicial error was done either of the defendants in omitting the elements of malice and unlawfulness from instruction No. 26, and that the judgment should be affirmed as to both of the defendants; while as to the defendant Gee Jon, concerning whom admissions and statements of the defendant Hughie Sing are admittedly not competent evidence, as to whom the court instructed the jury to disregard said admissions and statements, and against whom there is only circumstantial evidence, the writer does not feel justified in assuming the grave responsibility of saying that no prejudice was done by the failure of the court to embody in its instructions a definite requirement as to the elements mentioned.

10. It is also contended that the court erred in denying the application of the defendants for separate trials. The motion of Gee Jon for a severance is quite informal, and is based on the following statement:

"That upon the trial of this case certain testimony will be offered in evidence against the two defendants, which consists of the alleged admissions and statements made by his codefendant, Hughie Sing, to certain officers of the law, at Reno, Nevada; that such testimony is, in its nature, prejudicial to defendant Gee Jon, if said Gee Jon is tried jointly with the defendant Hughie Sing, * * * referring to the particular circumstances of the killing of the deceased."

Counsel insist that the granting or refusing of a severance, where good cause is shown, is not a matter of discretion in the trial court, and to sustain this position direct our attention to the case of State v. McLane, 15 Nev. 345, wherein the court had under consideration a statute substantially the same as the one now relied upon. Stats. 1921, p. 165. It is true that the court held in that case that, had an application for a separate trial been aptly made, showing good cause for a severance, the application should have been granted. The court held, however, that the application in that case was too indefinite to disclose the real merits thereof, and that it was not made in apt time. In view of the construction put upon the statute then in existence, and its reenactment by the legislature in 1921, after another statute had been in force for some years, we feel bound by the conclusion reached in the case mentioned. However, we do not think the motion in the case before us presents good cause for a severance. The motion merely states that certain admissions or statements made by Hughie Sing, prejudicial in their nature to Gee Jon, would be introduced in evidence. The motion was objected to upon the ground that no showing had been made warranting a severance.

The motion of counsel is silent as to what fact or facts the alleged admissions and statements would tend to establish, except that they refer to the particular circumstances of the killing of the deceased. Nowhere does it appear in the showing made that Hughie Sing had made a statement to the officers that either of the defendants participated in the killing, or that either of them was present at the time of the killing. From all that appears from the motion, the statement made by Hughie Sing may have been favorable to the defendants. The motion formed no basis of fact from which the court could determine the existence of good cause for a severance; it stated a mere conclusion. The motion of Hughie Sing is even less meritorious than that of Gee Jon. The court did not err in its rulings upon the motions.

**11.** It is also said that the evidence does not justify the verdict. We do not think we need review the evidence at length. It shows the presence of the defendants in Mina on the night of the killing; their mysterious conduct in stopping the jitney outside of town; their unsatisfactory explanation of their absence for a considerable length of time; the footprints leading from the jitney to the place of the killing and back to the place where the jitney stood; the presence of the two pistols in the jitney, and the unbelievable story told by the defendants, to the effect that the defendant Gee Jon was taken so sick that he had to turn back. We are convinced that the evidence justified the verdict.

**12.** It is also contended that the court erred in denying the motion in arrest of judgment. The motion was based upon the assertion that the statute (Stats. 1921, p. 387), authorizing the execution of persons convicted of murder in the first degree by the use of lethal gas, is violative of the terms of the federal and state constitutions prohibiting the infliction of cruel or unusual punishment, and that the provisions of the statute authorizing the infliction of the death penalty in the manner mentioned is indefinite and uncertain as to the formula to be employed. The act in question provides:

"The judgment of death shall be inflicted by the administration of lethal gas. The execution shall take place within the limits of the state prison, wherein a suitable and efficient enclosure and proper means for the administration of such gas for that purpose shall be provided by the board of prison commissioners. The warden of the state prison must be present, and must invite a competent physician, and not less than six reputable citizens, over the age of twenty-one years, to be present at the execution; but no other persons shall be present at the execution."

We are not in accord with either of the contentions. What has been the punishment for centuries for the crime of murder, of the character we know as murder in the first degree? It has been death. For the state to

take the life of one who perpetrates a fiendish murder has from time immemorial been recognized as proper, and as being neither cruel nor unusual. The act in question authorizes the taking of the life of a murderer as a penalty for the crime which he commits. It is the same penalty which has been exacted for ages— sanctioned in the old biblical law of "an eye for an eye and a tooth for a tooth." It is true that the penalty has been inflicted in different ways; for instance, by hanging, by shooting, and by electrocution; but in each case the method used has been to accomplish the same end—the death of the guilty party. Our statute inflicts no new punishment; it is the same old punishment, inflicted in a different manner, and we think it safe to say that in whatever way the death penalty is inflicted it must of necessity be more or less cruel.

But we are not prepared to say that the infliction of the death penalty by the administration of lethal gas would of itself subject the victim to either pain or torture. Counsel say we must take judicial notice of facts and conclusions reached as the result of scientific research, and it is insisted that from the knowledge thus acquired we must declare that the law in question provides a cruel and inhuman method of enforcing the death penalty. Without undertaking to state the limitations of the rule invoked, we may say that, if we are controlled by our scientific knowledge of the subject, we must reject counsel's contention. For many years animals have been put to death painlessly by the administration of poisonous gas. Gas has been used for years by dental surgeons for the purpose of extracting teeth painlessly. No doubt gas may be administered so as to produce intense suffering. It is also true that one may be executed by hanging, shooting, or electrocution in such a bungling fashion as to produce the same result. But this is no argument against execution by either method.

The revulsion on the part of many to the idea of execution by the administration of gas is due to an

erroneous impression. The average person looks upon the use of gas with horror, because of the experiences incident to the late war. They forget that there are many kinds of gas, ranging from the harmless non-poisonous tear gas, which may be used for the quelling of a mob, and the ordinary illuminating gas, which may produce painless death, to the highly poisonous gas which sears and destroys everything with which it comes in contact. It may be said to be a scientific fact that a painless death may be caused by the administration of lethal gas. That suffering and torture may be inflicted by its administration is no argument against it. We must presume that the officials intrusted with the infliction of the death penalty by the use of gas will administer a gas which will produce no such results, and will carefully avoid inflicting cruel punishment. That they may not do so is no argument against the law.

13. We think it fair to assume that our legislature, in enacting the law in question, sought to provide a method of inflicting the death penalty in the most humane manner known to modern science. If the argument made in behalf of the unconstitutionality of the act is sound, the legislature can provide no method of inflicting the death penalty other than that now in vogue. In other words, science and progress must halt when face to face with a long-established usage. Such was not the spirit which prompted the incorporation into our organic law of the provision now invoked. Every enactment of our legislature must be deemed in harmony with our constitutional provisions until the contrary clearly appears. The legislature has determined that the infliction of the death penalty by the administration of lethal gas is humane, and it would indeed be not only presumptuous, but boldness on our part, to substitute our judgment for theirs, even if we thought differently upon the matter.

14. We can find no ground upon which to sustain appellants' contention. People v. Durston, 119 N. Y.

569, 24 N. E. 6, 7 L. R. A. 715, 16 Am. St. Rep. 859; Storti v. Commonwealth, 178 Mass. 549, 60 N. E. 210, 52 L. R. A. 520. Nor do we find any merit in the contention that the act is indefinite and uncertain. It is certainly no more so than the act which it purports to amend. Rev. Laws, 7281. That statute simply said that the punishment of death should be inflicted by hanging the defendant by the neck until he is dead, or by shooting him, at his election. The present statute provides that the judgment of death shall be inflicted by the administration of lethal gas, and that a suitable and efficient inclosure and proper means for the administration of such gas for the purpose shall be provided. We cannot see that any useful purpose would be served by requiring greater detail. Certainly, the statute infringes no provision of the constitution.

The judgment and order denying the motions for a new trial are affirmed, and the district court is directed to fix a time and make the proper order for the carrying into effect by the warden of the state prison the judgments rendered.

## ON PETITION FOR REHEARING

*Per Curiam:*

Rehearing denied.

COLEMAN, J.: I dissent.

## ON SECOND PETITION FOR REHEARING

By the Court, COLEMAN, J.:

Counsel for the appellants have presented a second petition for a rehearing wherein they urge a point not before suggested. This court has on several occasions held that a second petition for a rehearing would not be entertained when urged by the same party. Brandon v. West, 29 Nev. 135; Ward v. Silver Peak Co., 39 Nev. 80.

The practice pertaining to petitions for rehearing is governed by rule 15, which applies to criminal and civil cases alike, and the holding that a second petition for a rehearing will not be entertained in civil cases controls in criminal cases as well. State v. Hazzard, 137 Pac. 143; Ross v. State, 16 Wyo. 285, 94 Pac. 217; People v. Northey, 77 Cal. 618, 20 Pac. 129.

The petition must be denied for the further reason that the point now urged was not called to our attention when the case was originally submitted. Nelson v. Smith, 42 Nev. 302.

Petition is hereby denied.