# STATE *v.* BEHITER

No. 2971

March 5, 1934.                          29 P. (2d) 1000.

*McNamara & Robbins,* for Appellant:

*Gray Mashburn,* Attorney-General; *W. T. Mathews,* Deputy Attorney-General; *Harley A. Harmon,* District Attorney; and *Roger Foley,* Deputy District Attorney, for the State:

# OPINION

By the Court, SANDERS, C. J.:

The appellant, Joseph Behiter, designated here as defendant, was convicted of murder in the first degree· for the killing of Sylvia Reither, better known as "Maxine Armstrong," and was sentenced to death. Upon the trial, the accused relied upon his plea of "Not Guilty" and his defense of "Not Guilty by Reason of Insanity." The case is before us on appeal from an order denying a new trial and from the judgment. We note that no point is made that the evidence is insufficient to support the verdict, the judgment and sentence. The errors relied upon for reversal relate solely to the court's rulings on question of law arising in the course of the trial. The various assignments of error are classified and discussed in the opening brief under general topics, as follows: (1) Error in admission of evidence; (2) errors in instructions and refusal to give instructions requested by the defendant; (3) improper argument of the district attorney; (4) error in refusing to grant a new trial upon the ground of after-discovered evidence.

In order to thoroughly understand the various objections and the court's rulings thereon, it will be necessary to give a statement of the facts concerning the homicide and a synopsis of the testimony bearing upon the assignments of error.

Sylvia Reither, referred to throughout the record as "Maxine," was a habitant of the restricted district in the city of Las Vegas, Nevada. She, together with her consort, Fred Green, occupied apartment No. 6 of the Dees Apartments in that district. Between the hours of 8 and 9 o'clock, nearer 8 than 9, on the morning of July 23, 1931, Maxine was found lying nude crosswise her bed in her apartment in a pool of blood, unconscious and in a dying condition. As soon as possible she was removed to the Las Vegas Hospital, where, upon examination by a surgeon, it was discovered that her skull had been crushed, and within an hour after she died without regaining consciousness.

Fred Green, the consort of the deceased, testified that upon entering apartment No. 6 at about the hour of 8:30 on the morning of July 23, he discovered that the screen and the lock on the rear door had been torn and broken. Upon entering, he called to Maxine, asking what the screen and the door were doing open. Receiving no reply, he started towards the bedroom and met the defendant coming out. When asked what he was doing there, he replied that he heard her scream, and a colored person ran out. They then engaged in a scuffle, and Green called for help. One Norman Westmoreland, an occupant of an apartment near by, responded within a few minutes, and, while he held the defendant, Green entered the room, and, seeing Maxine in the condition described, rushed back and exclaimed: "He killed her." The defendant exclaimed: "I didn't do it. Let me go. Turn me loose. I didn't kill her, but I saw a nigger kill her." The scuffle continued between Westmoreland and the defendant, during which a night officer arrived and the defendant was taken to jail. Green, Westmoreland, and others then went into the room and saw on the bed a hammer, described in evidence as a

prospector's pick, the handle of which was smeared with blood. The pick had been taken from Westmoreland's automobile, parked at the Dees Apartments. The substance of the testimony of the witness, Norman Westmoreland, was that he heard a woman scream; that there was fresh blood on the defendant's hands, his shirt and coat. One witness, Mrs. I. O. Friend, testified that she stood across the street, opposite the apartment and in plain view; that her attention was attracted by loud screams of a woman, which impressed her as death screams, pleading for life, and that she saw no person run out of the apartment.

Shortly after the defendant had been taken to jail, he was brought back to the place of the homicide by Joe Keate, the sheriff, and his deputy, Glenn E. Bodell. On being questioned, the defendant protested his innocence, disclaimed having killed the deceased, and stated that a "nigger," or colored person, killed her. Officer Keate testified that, when the defendant had been taken back to jail, he had several conversations with him during the day, in which defendant maintained that he did not kill Maxine. He testified that, because of the persistent statements of the defendant, he felt that he should satisfy himself whether he had to look for another person. He testified that in the nighttime he contacted his deputy, Glenn E. Bodell, and requested him to come with him; that he was going to take the defendant down to the apartment and learn more about the crime. The sheriff and his deputy handcuffed the defendant at the hour of 2:30 o'clock on the morning of July 24, after the homicide, placed him in an automobile and drove to the apartment; on their arrival there, they went into the kitchen, turned on the light, and led the defendant into the bedroom, the sheriff standing on one side of him and the deputy on the other side; the sheriff testified that both questioned the defendant kindly, using no force, no promises or threats, and in response to questioning the defendant maintained that a colored person or nigger killed Maxine. At this point counsel

for the defendant interposed the objection that the witness should not be permitted to testify to the conversation had at that time unless it was shown that any statement made by defendant relative to the crime was freely and voluntarily made, and, in order to determine this, a question of law, he suggested that the further examination of the witness Keate be continued without the presence of the jury. The request was granted. On the cross-examination of Keate we note that an attempt was made to lay a foundation for the contradiction or impeachment of the testimony of the witness respecting the conversation had with the defendant at that time. When the examination was concluded, counsel for defendant requested that he be permitted to interrogate Bodell relative to the conversation and to the incidents which occurred at the time. The request was denied. Whereupon the court ruled that the testimony of Officer Keate was admissible in evidence. The examination of Keate was continued in the presence of the jury, and over defendant's objections he was permitted to testify relative to other conversations had with defendant alone and in the presence of others, involving incriminating admissions of the defendant.

A witness for the state, one Mary Young, was, over the objections of the defendant, permitted to testify that at about 8 o'clock on the morning of the 23d the defendant entered her room in the Honolulu Inn in the restricted district in the city of Las Vegas and but a short distance from the Dees Apartments. She testified that defendant's presence there awakened her, and that she was frightened by the defendant standing over her, looking mad; that he had something concealed in his shirt; that she screamed and he told her to hush; that a difficulty between them ensued, and both landed out into the street when others, hearing the disturbance, appeared, and the defendant quieted down. Over the defendant's objections, the witness was asked questions relative to the condition of her room. The substance of her testimony was that the drawers of her dresser had

been opened and their contents disheveled and confused. In that connection the state's attorney, in response to the court's questions, stated that the purpose of this questioning was to show motive and the defendant's state of mind. Upon this theory the evidence as to the condition of the room and what occurred there was permitted to go to the jury.

When the state rested, the defendant was called as a witness in his own behalf. He was questioned respecting his history, the time he had resided in Las Vegas, his occupation, his friendly relations with the officer, Bodell, his physical and mental condition, and as to certain conversations he had had with Officer Bodell relative to the homicide. On direct examination he was asked to relate what took place between himself and the witness, Mary Young, at the time she had testified to as a witness for the state. He testified that he stopped in at her place of business to talk to her, with no intention of having trouble; that it seemed to him that he lost his head and became very much frightened, and from that time he had no recollection whatever of what he did or what occurred up to the time he was being beaten at the Dees Apartments. The substance of his testimony relative to his mental condition was that everything seemed dark, that he was off, hazy minded, was suffering from headache, and that he had tried the very best he could to remember what occurred after the difficulty with Mary Young, but could not do so. In the course of his direct examination he testified that about four or five years ago he had been hit over the head with a pistol at Poplar Bluff, Mo., and that he went to a hospital there and took treatment for said injury, and that he stayed in the hospital for about a week, and since that time he was subject to pains in the head and was suffering from the same character of pains on the morning of the homicide. In the course of his direct examination he was questioned minutely respecting the statements made to him in the conversation at the hour of 2:30 o'clock on the morning of July 24 by Officer

Bodell and the incidents that occurred during the conversation. The conversation as testified to by him tends to show that his answers to the questions propounded to him by Officer Bodell were involuntary.

Officer Bodell was called as a witness for the defendant. In the course of his testimony on direct he qualified as an expert on fingerprints, but he was not asked on direct whether he had made any prints at the place of the homicide and compared them with prints made of the defendant's hand. On cross-examination, over the defendant's objections, the witness stated that he, not long after the homicide, made palm prints from the blood-smeared railing of the bed in apartment No. 6 of the Dees Apartments, which had forty-two characteristics of the palm prints made by him of the defendant's right hand.

On the part of the defense several witnesses who had known the defendant for a few months in the city of Las Vegas testified that they considered him mentally unsound. Several witnesses who gave testimony by deposition testified that they considered him mentally unsound; each giving his reasons for considering defendant insane.

The witnesses in rebuttal on the part of the state testified that in their opinion defendant was sane and knew right from wrong.

Upon conclusion of the trial, a volume of instructions were handed the foreman of the jury, together with several forms of verdict, from which the jury selected and returned the following: "We, the jury in the above-entitled cause, find the defendant, Joseph Behiter, guilty of murder in the first degree as charged in the information, and fix his punishment at death."

On the date fixed for the pronouncement of judgment, the defendant moved the court for a new trial on the ground of after - discovered evidence, set forth in the affidavit of one of counsel for the defendant, then presented to the court. .. Upon argument, the motion was overruled. Whereupon judgment was pronounced

in accordance with the verdict of the jury, and the defendant was sentenced to death by lethal gas in the mode and manner as prescribed by the law of this state.

1. We note from the record that the judgment was pronounced on November 2, 1931. The appeal from the judgment and order denying a new trial was not submitted to this court for decision until on September 18, 1933, since which date this court has given careful and thorough examination of the record to determine whether or not there has been a miscarriage of justice and whether the defendant has been prejudiced in respect to a substantial right. The court is admonished by statute (section 11266, N. C. L.) that no judgment shall be set aside or new trial granted in any case on the ground of misdirection of the jury or the improper admission or rejection of evidence, unless in the opinion of the court, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice or has actually prejudiced the defendant, in respect to a substantial right. In several cases the court has had occasion to point out that the statute is designed to inhibit courts from setting aside judgments or granting new trials, where, upon examination of the entire case, the verdict is manifestly right or where it appears that no other verdict could have been properly returned by the jury.

The various assignments of error are gathered from the record by learned counsel, formerly judge of one of our district courts, who did not represent the defendant upon his trial. The assignments have been selected with care and have been presented with assiduity and argued with ability. Counsel insist that, in view of the entire record and accumulations of alleged error, a judgment of reversal is warranted under the law and facts in the interests of justice and humanity.

I look with disfavor on counsels' conclusion because the elements which would entitle their most unfortunate client to the charity of the law are not present to the facts of this case.

The general assignment that the court erred in the admission of evidence is subdivided in the opening brief into several headings: (1) The court erred in permitting the improper cross-examination of the defendant relative to admissions and confession not shown to be voluntary. (2) The court erred in permitting certain admissions and confession of the defendant in evidence induced by hope of reward, promise of immunity from punishment, and under circumstances sufficient to create terror or fear in the mind of the defendant. (3) The court erred in permitting a witness for the defendant on cross-examination to testify relative to the results made by the witness of comparison of palm prints lifted or made from the blood-smeared railing of the bed in the apartment where the homicide occurred with the palm prints lifted or taken by the witness from the defendant's right hand.

2, 3. The chief ground upon which the defendant complains that the trial court, over his objections, admitted in evidence his admissions and confession, not shown to be voluntary, has its source or basis in a conversation by the sheriff and his deputy, had with the defendant at the hour of 2:30 o'clock on the morning after the homicide at the place of the homicide, with no one present other than the two officers and the defendant. Sheriff Joe Keate, a witness for the state, was questioned in direct and cross relative to what was said to and by the defendant on that occasion. The substance of Officer Keate's testimony was that the defendant was questioned kindly, and that no promises or threats were made, and that, in response to repeated questioning, the defendant maintained that he did not commit the crime, but that a nigger or colored person did it. The record discloses that the testimony of the defendant, as a witness in his own behalf, and that of Deputy Sheriff Bodell, as a witness for the defendant, flatly contradicted the statement of the witness Keate. Bodell testified that the defendant was shaky and nervous; that he said to the defendant: "Joe, I have got you dead bank. There's your finger

prints on the bed. You killed her." "Joe, how many times did you hit her?" Defendant said: "I don't remember. I was dizzy and mad"—that he was crazy and trying to get away; that he did not intend to hurt her; that he thought it was a hammer that he hit her with. Bodell said: "Joe, you had better come clean. You might beat the gas." The witness stated that it was dark in the room and that he threw a flashlight on the bed of blood and hair, and that he thought the defendant was going to faint; that he reached up in the dark and dropped a fan on the floor to startle defendant; that the defendant was startled and suddenly exclaimed: "Don't. I did it."

Under the decisions of this court and the numerous cases cited in the brief of counsel for the defendant, there can be no controversy as to the law relative to the introduction in evidence of a confession when relied upon by the state to connect the accused with the commission of the crime charged. In the view we take of the record respecting the conversation had with the defendant by the two officers at the unusual hour on the morning after the homicide, there is nothing in the conversation, as testified to by Sheriff Keate, to connect the defendant with the murder, but, on the contrary, no admission or confession was made by the defendant in the course of the conversation. The defendant, in response to repeated questions, actually denied that he killed the deceased, and insisted that a negro or colored person had killed her. Except for the statements made by Officer Bodell in his account of the conversation, there was no testimony or a circumstance to show that the defendant made any admissions and confession. Sheriff Keate testified that no confession was made. Bodell, on the other hand, testified that one was made under circumstances tending to show that it was involuntarily made. In this situation the defendant is in no position to predicate error upon the admission in evidence of his admissions and confession, as testified to and detailed by his own witness. An accused is entitled to introduce evidence to rebut the claim of

the state that his confession was voluntary. State v. Williams, 31 Nev. 360, 102 P. 974. But here there was no testimony on the part of the state upon which it could possibly rely to connect the defendant with the murder. Consequently, this, a reviewing court, cannot say that as a matter of law the defendant was injured by the introduction in evidence of his admissions and confession, testified to by his own witness, and without which there was no testimony to show that a confession was made in the conversation referred to and that it was involuntary.

4-6. Error is predicated upon a conversation testified to by Sheriff Keate had with the defendant subsequent to that as testified to by him and Officer Bodell on the morning of the 24th, in which Keate testified, in answer to a question, as follows:

"A. He, the defendant, was telling me during the course of this conversation that the morning that the crime was committed that he had had a couple of bottles of beer and that he wandered down in the district and when he got down there that there was some blond girl that he had been to see before, and that he went to the place, what he thought was her room, but it seemed as though there was another woman there that he didn't recognize and that something in the way of a row took place, and that there was a rock lying by the door, as he remembered it, he didn't know whether he threw it at her or just what happened. He said that he went away. He was mad and he kept getting madder and that he went to some car and in the back seat of that car he found a hammer and he wanted to get even. It seemed like that he was afraid. He said there might be someone after him, and that when he went in the room, one time he said the woman screamed, and that he did not know how many times he hit her. There was another conversation took place along the lines, but there was some change from that."

"A. This other time in talking about the affair he said that when he stepped in the room that the girl screamed and he said 'shush' to her to keep quiet, and

there was other things that we talked about in general."

We do not think the statements quoted amount to a confession. At most, they were admissions of certain facts which indicated the guilt of defendant. An admission, as applied to criminal law, is something less than a confession, and is but an acknowledgment of some fact or circumstances which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt. People v. Ferdinand, 194 Cal. 555, 229 P. 341. The rule is well settled that with reference to admissions, as distinguished from confessions, it is not necessary to show preliminarily to their introduction in evidence that they were made voluntarily by defendant, without the use of coercion or intimidation of any sort, and without promise of reward or immunity from punishment. People v. Cronevitch, 86 Cal. App. 646, 261 P. 309, 311. It must therefore be concluded that the contention of counsel cannot be sustained.

7. In the case of People v. Cronevitch, supra, the court said: "But aside from the admissions made by defendant, the other evidence was so strong and so suggestive of the guilt of defendant that, as a matter of law, it may not be said that any injury resulted to defendant by reason of the introduction in evidence of such admissions." So, in this case, in view of the other evidence which points almost conclusively to the defendant's guilt, we, as a matter of law, cannot say that the defendant was injured by his admissions and confession as shown by his own witness, Deputy Sheriff Bodell. The circumstances proven were apparently conclusive of defendant's guilt, regardless of his admissions and confessions, so that any mistake or error in their admission probably would not have changed the verdict. State v. Williams, supra.

8-10. The point is raised that the trial court committed error in admitting evidence of another offense committed by the defendant. The offense referred to is defendant's entry into the room of Mary Young in

the Honolulu Inn, a short distance from the Dees Apartments, and shortly before his entry into the apartment of the deceased. The evidence was admissible for two reasons: (1) That evidence of another offense is admissible if tending directly to prove defendant's guilt of the charge. State v. Hall, 54 Nev. 213, 13 P. (2d) 624. (2) That no injury resulted from the admission of the evidence in that and for the reason that the defendant, as a witness in his own behalf, grounded his defense of insanity upon the alleged offense in that he testified that after his entry into Mary Young's room he lost his memory and had no recollection of what occurred afterwards.

11. The next assignment of error relates to the claimed improper cross-examination of the defendant's witness Bodell respecting the result of the comparison made by him of palm prints of the defendant's right hand with the impression of palm prints lifted from the blood-smeared railing of the bed upon which the deceased was lying when found. On direct examination, the witness was qualified as a finger print expert, but he was not questioned on direct respecting any impressions taken for the purpose of identifying the defendant as the perpetrator of the crime charged. We note that the court, in ruling upon the objection as not being proper cross-examination, stated that the door had been opened on direct for the questioning. We agree with the trial court. On direct the witness was asked this question: "On or about the 23d day of July, 1931, did you conduct an investigation into the matter of the killing in the Dees Apartments?" He answered: "I did." We think, therefore, that it was proper to ask the witness on cross-examination as to the result of his investigation in the Dees Apartments. Moreover, the particular testimony given by the witness on which prejudice is predicated was not objected to.

12. Numerous errors are assigned to the misdirection of the jury and the court's refusal to give directions requested by the defendant. In view of the admonition of the statute that no judgment shall be reversed on the

ground of misdirection of the jury, unless in the opinion of the court, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice or has actually prejudiced the defendant in respect to a substantial right, we cannot say that the errors complained of so resulted. The learned counsel for the defendant complains mostly of the instructions bearing upon the defense of insanity. Our attention is particularly directed to the defendant's exceptions taken to instructions Nos. 14 and 15, which read as follows:

"To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act, the defendant was laboring under such a defect or suffering from disease of the mind as not to know the nature or quality of the act he was doing, or, if he did know it, that he did not know that he was doing what was wrong. The true test of insanity is whether the accused, at the time of committing the crime, was conscious that he was doing what he should not do; and if he was conscious that he was doing wrong and acted through malice or motives of revenge, he cannot avail himself of the defense of insanity. Plaintiff's Instruction No. 38 c."

"With regard to methods of proof upon which the defense of insanity may be established, the law from which consideration of public policy, the welfare of society and the safety of human life, proceeds with great caution, and has adopted a certain standard by which the insanity of the party on trial may be proved when relied upon.

"The burden of proving insanity rests upon the defendant and to warrant you in acquitting him solely upon that ground, his insanity at the time of committing the homicide—if you find that he did commit it— must be established by a preponderance of proof. The evidence of insanity must outweigh and overcome the presumption of and evidence in favor of sanity in some appreciable degree, and render it more probable that he was insane than that he was sane. Insanity, being

a fact to be proved by the defendant, must be established by evidence in the case with the same clearness and certainty as any other fact alleged by the defendant in his defense; that is to say, the proof must be such in amount that if the single issue of sanity or insanity of the defendant should be submitted to the jury in a civil case, they would find that he was insane. Insanity is not proved or established by simply raising a doubt as to whether it exists or not. Plaintiff's Instruction No. 38 d."

The language of which counsel complains in instruction No. 14 is: "It must be clearly proved," and the language complained of in instruction No. 15 is: "Proceeds with great caution," and the further language: "Insanity is not proved or established by simply raising a doubt as to whether it exists or not." It is insisted that the instructions are objectionable in that they are inconsistent with those approved relative to the same subject matter in the cases of State v. Clancy, 38 Nev. 181, 147 P. 449; State v. Nelson, 36 Nev. 403, 136 P. 377; State v. Lewis, 20 Nev. 333, 22 P. 241. We do not so interpret the instructions. They do not invade the province of the jury nor do they disparage the defendant's defense of insanity.

13. The court refused to give appellant's offered instruction, which reads: "The jury are instructed that if the State has failed to introduce proof which it might have done concerning the finger prints taken at the scene of the crime, it is a circumstance to be considered in reaching a conclusion as to the guilt or innocence of the defendant, and that if evidence within the power of the State to produce and not accessible to the defendant is withheld by the State, the jury are authorized to infer that, if produced, it would be against the contentions of the State."

It is contended that this was error because finger prints were taken by the officers from various articles of furniture in the room where the homicide occurred shortly after the killing and compared with appellant's finger prints by an officer who was an expert in this

respect and who was in attendance upon the trial of the case under subpena by the state, but who did not testify as to the result of such investigation. Appellant is mistaken in this contention. The officer referred to was placed on the stand by appellant, and on cross-examination testified to the result of this investigation. His testimony in this respect was unfavorable to appellant. The proposed instruction was therefore not applicable and properly refused.

We find no error in the court's refusal to give the instruction requested by the defendant respecting the subject of motive. We are of the same opinion as to the exceptions taken to other instructions given and those refused.

Counsel raises the point that the court erred in refusing to grant a new trial upon the ground of after-discovered evidence. Upon the authority of State v. Willberg, 45 Nev. 183, 200 P. 475, we are constrained to hold that the ruling was correct.

The point is stressed that the attorney for the state was permitted, over the defendant's objections, to indulge in improper and most prejudicial statements in his closing argument to the jury. It seems that district attorneys, in their enthusiasm and energies, overlook, or at least disregard, the numerous cautions to be found in many opinions of this court. However, we cannot say that in this case the argument complained of was such as to constitute reversible error.

After an examination of the entire record, we conclude that no verdict other than guilty of murder in the first degree, as charged in the information, could have been reached. The judgment and order appealed from are affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison the judgment rendered.

DUCKER, J.: I concur.

COLEMAN, J., concurring:
While I am of the opinion that the trial court erred

in permitting the cross-examination of defendant's witness Bodell, I think the defendant was in no way prejudiced thereby; hence I concur in the order.

## On Petition for Rehearing

June 1, 1934.
*Per Curiam:*
Rehearing denied.
Coleman, J.: I dissent.